STATE of Missouri, Respondent,

v.

Scott D. KUSGEN, Appellant.

No. WD 64340.

Missouri Court of Appeals,
Western District.

Sept. 20, 2005.

Application for Transfer to Supreme Court
Denied Nov. 1, 2005.

Application for Transfer Denied
Dec. 20, 2005.

Kenneth Morris Dake, Sedalia, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Lisa M. Kennedy, Asst. Attorney General, Jefferson City, MO, for Respondent.

Before JAMES M. SMART, JR., P.J., RONALD R. HOLLIGER, and LISA WHITE HARDWICK, JJ.

JAMES M. SMART, JR., Judge.

Appellant Scott Kusgen was convicted of attempting to steal anhydrous ammonia, § 570.030.1. Kusgen challenges the sufficiency of the evidence to support his conviction. We affirm.

### Facts

In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict. *State v. Storey*, 901 S.W.2d 886, 891 (Mo. banc 1995).

At around midnight on a November evening, two Pettis County officers, David Hockaday and Tony Roberts, went to investigate the anhydrous ammonia tanks at Guier Chemical and Fertilizer Company. Anhydrous ammonia had been stolen from these tanks on at least two recent occasions. The Guier facility is located on four acres of land, surrounded by farmland belonging to others. The Guier facility includes contains two 15,000–gallon tanks that store anhydrous ammonia.

The anhydrous ammonia is sold to farmers only during fertilizing season (the spring months). Purchasers use a gravel road to drive up to the tanks. The business was closed in the evenings. No purchasers had an arrangement whereby they could obtain ammonia when the business was closed.

When the officers arrived at the Guier property, they parked their patrol car in the northeast corner of the parking lot. The officers got out of the patrol car and walked around the property and observed no activity in the vicinity at that time. The evening sky was bright due to a full moon. There was one artificial light on the property near the building, not by the tanks.

As the officers walked back to their car along the northern edge of the property, they saw a car going north on a neighboring highway. The officers avoided detection. The car slammed on its brakes as it passed the facility, coming to a sudden stop just north of the property. Officer Hockaday estimated that the distance between the officers and the vehicle was around one-tenth of a mile. A short time later, the officers saw two people exit the vehicle and head east across a cornfield that bordered the facility. The officers had moved between two of the smaller tanks where they could not be seen. The officers could not see what the suspects looked like or what they were wearing. The car these two subjects had exited accelerated northbound on the highway.

The cornstalks were 12 to 15 inches high because the field had been harvested. There were terraces throughout the field.

According to the officers, the two subjects "cut across the cornfield in a diagonal motion." For the next twenty minutes, the officers "periodically" saw the subjects as they "duck[ed] down for a little bit and c[a]me in and out" of the terraces. The subjects waited in the valleys of the terraces to avoid being seen by anyone that might drive by on the road. The officers also heard a hollow, thumping noise that sounded like two plastic containers banging together.

The subjects stopped their approach to the tanks after they had crested the last terrace. They had not yet reached the Guier property, and they were about 50 feet short of the officers' location. The officers recognized that from the subjects' location, the officers' patrol car was visible. It would not have been visible prior to that because of the outline of the tanks and the positioning of the car. The officers heard whispers. Then the officers saw the two subjects head back to the area they had just crossed.

Deputy Hockaday entered the cornfield. By that time, he had lost sight of the subjects. Deputy Roberts drove the patrol car into the field and conducted a perimeter search. He discovered Kusgen about 200 feet from the northeastern corner of Guier's property. According to Deputy Roberts, Kusgen was "curled up in a ball," hiding in the grass. He was wearing camouflage clothing and rubber gloves.

The officers arrested and searched Kusgen. One of the items they found was a flashlight that had been wrapped in black electrical tape. The flashlight appeared to be wrapped in such a manner as to make the light less detectable. The officers placed Kusgen in the patrol car and drove around the cornfield to look for the second suspect. During this time, Kusgen explained that he had been "coon hunting" in the cornfields. He also said that he was looking for his German Shepherd when the officers found him. At no time that evening, either before or after Kusgen was arrested, did the officers see a dog or hear any barking. Nor did anyone ever find the second suspect.

Later that morning, around 6:30 a.m., Officer Brian McLemore searched the fields around the Guier property. About 100 yards north of the anhydrous ammonia tanks, he found two five-gallon plastic jugs and a garden hose. The garden hose had an anhydrous hose fitting that could be hooked up to one of the tanks and was wrapped in black tape. This location was not on the Guier property.

At trial, Kusgen presented no evidence on his behalf. The jury convicted Kusgen of attempted theft of anhydrous ammonia, § 570.030. The court sentenced Kusgen to serve one year in the Pettis County Jail and to pay a $500 fine.

Kusgen appeals.

### Sufficiency of the Evidence

Kusgen's first point challenges the sufficiency of the evidence to support his conviction for attempted theft.

Our review of this claim is limited to whether there is sufficient evidence for a reasonable factfinder to find guilt beyond a reasonable doubt. *State v. Black*, 50 S.W.3d 778, 788 (Mo. banc 2001). In considering whether the evidence is sufficient to support the verdict, we must look to the elements of the crime and consider each in turn. *State v. Grim*, 854 S.W.2d 403, 411 (Mo. banc 1993). We are required to take the evidence in the light most favorable to the State and to grant the State all reasonable inferences from the evidence. *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989). We disregard contrary inferences, unless they are such a natural and logical extension of the evidence that a reasonable

juror would be unable to disregard them. *Grim*, 854 S.W.2d at 411. Taking the evidence in this light, we consider whether a reasonable factfinder could find each of the elements beyond a reasonable doubt. *Id.*

■ Section 564.011.1 states that "[a] person is guilty of attempt to commit an offense when, with the purpose of committing the offense, he does any act which is a substantial step towards the commission of the offense." Thus, the crime of attempt has two elements: (1) the purpose to commit the underlying offense, and (2) the doing of an act which is a substantial step toward the commission of that offense. *State v. Withrow*, 8 S.W.3d 75, 78 (Mo. banc 1999) (*citing State v. Molasky*, 765 S.W.2d 597, 601 (Mo. banc 1989)).

The underlying offense of stealing is committed when a person "appropriates property or services of another with the purpose to deprive him or her thereof, either without his or her consent or by means of deceit or coercion." § 570.030.1. Section 570.030.4 expressly makes the "theft of any amount of anhydrous ammonia" a class D felony.

The following facts favorable to the verdict were introduced in the State's case:

- At around midnight on a November evening, two Pettis County officers went to investigate the anhydrous ammonia tanks at Guier.
- About a tenth of a mile away, a car going north on a neighboring highway slammed on its brakes as it passed the facility. Two people exited the vehicle and headed east across a cornfield that bordered the facility. There were terraces throughout the field.
- For the next twenty minutes, the two subjects surreptitiously "cut across the cornfield in a diagonal motion" and headed toward the ammonia tanks. They were careful to avoid detection, walking in the valleys of the terraces. The officers heard a hollow, thumping noise that sounded like two plastic containers banging together.
- The subjects stopped their approach to the tanks after they had crested the last terrace. They had not yet reached the Guier property, and they were about 50 feet short of the officers' location. From the subjects' location, the officers' patrol car would have been visible. It would not have been visible prior to that because of the outline of the tanks and the positioning of the car. The officers heard whispers after the subjects had stopped, and then they saw them run back to the area they had just crossed.
- In a perimeter search, officers found Kusgen about 200 feet from the northeastern corner of Guier's property.
- Kusgen was "curled up in a ball," hiding in the grass. He was wearing camouflage clothing and rubber gloves. A search of Kusgen yielded a flashlight that had been wrapped in black electrical tape, which had apparently been done to dim the light so that it would be less detectable.
- Kusgen told the officers that he had been coon hunting in the cornfields. He also said that he was looking for his German Shepherd when the officers found him. At no time that evening did the officers see a dog or hear any barking. Kusgen had no gun with him to use in hunting.
- Later that morning, about 100 yards north of the property, an officer found two five-gallon plastic jugs and a garden hose.

As Kusgen points out, the officers could not identify Kusgen as one of the persons who they saw exiting the car on the highway and crossing the cornfields. Still,

there was ample circumstantial evidence that he was one of the subjects. Kusgen was found minutes after the two subjects turned around, just as they were about to reach the Guier property. He was found about 200 feet from the property, hiding in the fields. Given the remote, rural location, the only logical inference from this evidence is that Kusgen was one of the individuals the officers had just witnessed moments earlier. This circumstantial evidence carries the same weight as direct evidence. *See State v. Hutchison,* 957 S.W.2d 757, 767 (Mo. banc 1997).

There was persuasive circumstantial evidence that Kusgen was in the cornfields for the purpose of stealing anhydrous ammonia from the Guier facility. The subjects slowly and methodically moved across the cornfields, attempting to conceal themselves. They waited in the valleys of the terraces to avoid being seen by anyone that might drive by on the road. They stopped and turned around only when they reached a point from where the patrol car would have been visible. The jury reasonably could have concluded that this conduct was "strongly corroborative" of the individuals' intent to engage in illegal activity. The jury could also have found that the subjects demonstrated a firm intent to steal some ammonia and that it was only the fact that they saw the patrol car that caused them to abort their mission. The jury could reasonably have believed that if the officers and the patrol car had not been present, the subjects would have completed their mission.

The discovery of the plastic jugs and the garden hose along with the camouflage clothing, the rubber chemical gloves, the flashlight wrapped in electrical tape, the surreptitious conduct and implausible explanation all demonstrated firmness of purpose to complete the theft.

Kusgen claims that despite this circumstantial evidence his conviction must be reversed because there was no evidence that he took a *substantial step* toward stealing anhydrous ammonia.

Section 564.011.1 defines a "substantial step" as "conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense." This statute repealed the common law definition of attempt codified in section 556.150. *State v. Young,* 139 S.W.3d 194, 198 (Mo.App.2004). Common law attempt was a "tougher test" requiring proof of an overt act in perpetration of the crime, i.e., some act beyond mere preparation. *Id.* (*citing Molasky,* 765 S.W.2d at 600). However, under section 564.011.1, mere preparation *may qualify* as a substantial step under certain circumstances. *See, e.g., State v. Mickle,* 164 S.W.3d 33, 46 (Mo.App.2005) (conviction for attempted manufacture of methamphetamine where defendant possessed various items commonly used to manufacture methamphetamine); *Young,* 139 S.W.3d 194 (conviction for attempted statutory rape where defendant arranged a meeting place for a sexual encounter with a minor and arrived there at the prearranged time). *Any* conduct clearly showing a firmness of intent to complete the crime is sufficient. *See Mickle,* 164 S.W.3d at 46; *Young,* 139 S.W.3d at 198.

Here, over the course of twenty minutes, Kusgen systematically and furtively traveled through the cornfields that surrounded Guier's anhydrous ammonia tanks. He did so while possessing a flashlight, two plastic jugs, and a garden hose. The only thing that stopped his approach to the tanks, and caused him and his accomplice to change their plan, was the sight of the patrol vehicle. Under these circumstances, the surreptitious approach with the tools he would use to steal ammo-

nia demonstrated a firm purpose to steal. "Conduct constituting a substantial step includes possession of materials ... that could not serve a lawful purpose under the circumstances." *State v. Farris*, 125 S.W.3d 382, 387 (Mo.App.2004).

It is true that Kusgen did not trespass on the Guier property while possessing the items necessary to steal the anhydrous ammonia. Instead, he reversed his path after he could see the officers' patrol car. The facts strongly suggest that, but for the officers' presence, Kusgen would have continued to the Guier property and stolen anhydrous ammonia from the tanks. The fact that a suspect retreats to avoid police detection or apprehension (upon observing police presence) does not vitiate the existence of a firmness of intent prior to the police-induced decision to abort the mission. Convictions for attempt have been upheld under circumstances where the defendant had a clear firmness of purpose but was for some reason or another unable to commit the crime. *See Young*, 139 S.W.3d at 197–98 (defendant who arrived at a hotel to commit statutory rape could not complete the crime because an undercover police officer had been posing as the minor); *State v. Sellars*, 98 S.W.3d 124, 127–28 (Mo.App.2003) (*overruled in part on other grounds by Young*, 139 S.W.3d at 197, n. 4) (defendant who went to the site of a methamphetamine lab and waited there to purchase meth could not complete the crime of possession because officers had discovered the operation before the manufacturing process was complete).

Here, although Kusgen did not place a hose on the tanks or even reach the Guier property before aborting the plan, the jury was entitled to conclude that his decision to approach the tanks with the items necessary to steal anhydrous ammonia showed a firmness of intent to complete the theft. We cannot act as a " 'super

juror' with veto powers" over their conclusion. *See Grim*, 854 S.W.2d at 414.

Kusgen relies on *State v. Ballenger*, 72 S.W.3d 154 (Mo.App.2002) (*overruled in part by Young*, 139 S.W.3d at 197, n. 4). *Ballenger* also involved a conviction for attempted theft of anhydrous ammonia. 72 S.W.3d at 155. The defendant was one of three individuals inside a truck that parked near an anhydrous ammonia tank on a private farm. One of these individuals approached the tank. With a flashlight, that individual inspected the area of the tank that would have been used to obtain the anhydrous ammonia. Police officers, who had the premises under surveillance, began walking toward the truck. Moments later, the individual walked back to the truck, which then drove away. *Id.* This court held that shining the flashlight on the tank "cannot constitute a 'substantial step' under section 564.011.1." *Id.* at 158. Thus, this court held that the appellant's actions fell short of an actual attempt.

*Ballenger*, while factually similar in some ways to the situation here, is distinguishable. The opinion in *Ballenger* neither states nor necessarily implies that the suspects observed the police officers before leaving. Thus, it is not clear what triggered the decision of the suspects to leave. The suspects' actions under the circumstances were less corroborative of a firmness of purpose to steal anhydrous ammonia. It is unclear whether the retreat from the tank was due to police detection. *See State v. Presberry*, 128 S.W.3d 80, 101 (Mo.App.2003) (Dowd, J., dissenting) (noting that the suspect in *Ballenger* "*voluntarily* withdrew from the tank") (emphasis added). Even if we assume it was the police presence that caused the suspect's retreat, his conduct was still arguably less corroborative of an intent to commit the crime than the con-

duct in this case. In any event, *Ballenger*'s approach to the "substantial step" analysis—requiring an act beyond mere preparation—was overruled by *Young* (noting that prior cases had "jumbled the elements of prior [common law] attempt ... with elements of ... section 564.011"). *Young* 139 S.W.3d at 198. This development undermines the weight of the holding in *Ballenger.* Thus, we do not agree with Kusgen that *Ballenger* dictates a reversal in this case. .

■ "What act or conduct will constitute a substantial step will depend on the facts of the particular case." *Molasky,* 765 S.W.2d at 601. We conclude that under the facts of *this* particular case there was sufficient evidence from which a reasonable juror could have concluded beyond a reasonable doubt that Kusgen had taken a substantial step indicating firmness of purpose in stealing anhydrous ammonia. Therefore, we conclude the evidence was sufficient for a reasonable juror to convict Kusgen of attempting to commit that offense.

### Evidence of Uncharged Misconduct

■ Kusgen's second point challenges the admission of Deputy Roberts' testimony concerning the manufacturing of methamphetamine. Kusgen fails to provide, with a citation to the record, the exact portion of the testimony he contests. We assume he objects to the following exchanges:

Q. Deputy Roberts, have you had any special training in investigation of methamphetamine cases?

A. Yes, I have.

Q. ... Can you tell us what your training consisted of?

A. It was a ... clandestine methamphetamine lab training. I'm certified through the State.

Q. ... [I]n the lab did you and some of the other guys that went through it, did you actually make some methamphetamine?

A. Yes. That's a requirement [of the training].

Q. Are there several ways of making it?

A. Yes.

Q. Does one way involve the use of anhydrous ammonia?

A. Yes.

\*    \*    \*

Q. Are there some other chemicals that are used in the manufacture of methamphetamine?

A. Yes.

Q. Like what?

A. There's Red Devil Lye, other—there's a lot of components to making methamphetamine, different chemicals.

Q. Is pseudoephedrine one of them?

A. Yes.

Q. The main ingredient in Sudafed?

A. Yes.

Q. And some other nasal or congestion products, I guess?

A. Yes.

Q. Okay. Are there some hazards involved in making methamphetamine?

A. Yes.

Q. What are some of those?

A. It's got an inhalation hazard. When they're making meth, it puts off a noxious odor that actually if you breathe too much of it, it could kill you. It's also very flammable, which makes it explosive. And ... if you get in contact with your skin with the chemicals, it will give you a chemical burn on your skin.

\*    \*    \*.

Q. In your training and experience, is it common for people who manufacture

methamphetamine to divide up the duties?

A. Yes.

Q. How do they do that?

A. One subject might be in charge of going and getting the pills from the store.... [A]nother subject would be in charge of going to the tanks and stealing anhydrous, and another person might be in charge of [ ] getting all of the ingredients together and then making the methamphetamine.

Kusgen points out that the charges against him were for stealing *anhydrous ammonia*, not manufacturing *methamphetamine*. Kusgen contends that Roberts' testimony, which discussed an unrelated, uncharged crime, was inadmissible.

 Evidence of uncharged misconduct is inadmissible for the purpose of showing the defendant's propensity to commit similar crimes. *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993). This rule applies only when the evidence shows that the defendant was, in fact, involved in another crime. *State v. Briscoe*, 913 S.W.2d 812, 814 (Mo.App.1995). Here, Roberts' testimony did not directly link Kusgen to the uncharged crime of manufacturing methamphetamine. It was a vague description of how methamphetamine is manufactured and made no reference to the defendant.

In any event, the testimony was relevant to establish a motive for the charged crime. It is conceivable that a juror might be sufficiently uninformed about the uses of anhydrous ammonia as to think it unlikely that anyone would go to a great deal of effort to steal fertilizer. Thus, such a juror might think it unlikely that Kusgen was actually attempting to steal something. The State should be entitled to show that anhydrous ammonia is used in the production of methamphetamine. The probative value of this evidence to show motive was thus substantial. *See State v.*

*Morrow*, 968 S.W.2d 100, 107 (Mo. banc 1998).

We note also that there is no indication that Deputy Roberts' brief comments prejudiced Kusgen's defense. The erroneous admission of evidence is not reversible unless that evidence prejudiced the defendant's right to a fair trial. *Briscoe*, 913 S.W.2d at 815.

The trial court did not clearly abuse its discretion in admitting the testimony. *See State v. Stoner*, 907 S.W.2d 360, 363 (Mo. App.1995). Point denied.

### Conclusion

For the foregoing reasons, the judgment is affirmed.

HOLLIGER and HARDWICK, JJ., concur.