STATE of Missouri, Respondent,

v.

Ricky Eugene MORGAN, Appellant.

No. ED 96746.

Missouri Court of Appeals,
Eastern District,
Division Two.

April 10, 2012.

Motion for Rehearing and/or Transfer to
Supreme Court Denied May 24, 2012.

Emily N. Kaiser, St. Charles, MO, for appellant.

Chris Koster, Atty. Gen., Karen L. Kramer, Asst. Atty. Gen., Jefferson City, MO, for respondent.

LAWRENCE E. MOONEY, Judge.

The defendant, Ricky Eugene Morgan, appeals the judgment entered on a jury verdict finding him guilty of attempt to commit the offense of stealing anhydrous ammonia, Section 570.030 RSMo 2000.[1] Defendant advances five points of trial-court error. He first challenges the sufficiency of the evidence to support his conviction. Defendant claims the State presented insufficient evidence to prove that he possessed the equipment to steal anhydrous ammonia, or that he had taken a substantial step towards stealing the anhydrous ammonia. In his four remaining points, Defendant contends the trial court erroneously admitted certain evidence at trial. He first takes issue with the testimony of the law-enforcement officer, in which the officer stated he knew defendant's "past" and that he "should have asked" defendant if he had used methamphetamine. Defendant contends this testimony constituted inadmissible evidence of uncharged misconduct. He next alleges that testimony regarding text messages in his cell phone lacked foundation. He further maintains the evidence seized from the car he was driving was the product of an unlawful stop, in that no reasonable suspicion justified the stop of the vehicle. And finally, he asserts that his statement that he had used drugs earlier in the day was the result of an unlawful, pre-*Mi-*

---

1. All statutory references are to the Revised Statutes of Missouri 2000.

*randa* [2] custodial interrogation. We hold that the State presented sufficient evidence to support the conviction. We further hold that either the court properly admitted the evidence or that the defendant failed to properly preserve the evidentiary issues for appeal. We therefore affirm.

### Factual and Procedural Background

Defendant's conviction in this case stem from events that occurred in the early morning hours of December 11, 2010, on a rural Marion County highway north of Hannibal, Missouri.[3] On that night, at about 1:00 o'clock in the morning, two deputies from the Marion County Sheriff's Office were each on patrol. Deputy Dennis McAfee was in his vehicle on a county road, just north of where it intersects with Highway 168, the highway leading north out of Hannibal. Deputy McAfee pulled over and shut off his headlights and engine. McAfee chose that particular area to stop because it allowed him to watch Bleigh Construction and Graupman Construction, as well as a large area of the bottomlands. The two construction sites are located alongside Highway 168. The construction companies had asked the sheriff's office to watch their sites. No one was supposed to be at their locations at this time of night. Additionally, thefts of anhydrous ammonia frequently occurred from the storage tanks located on the Bleigh Construction property. As explained at trial, anhydrous ammonia is a necessary ingredient in the manufacture of methamphetamine.

While parked, McAfee observed headlights coming out of Hannibal northbound on Highway 168. As the vehicle approached Bleigh Construction, the headlights veered to the left as though the vehicle was attempting to turn into a field entrance. The vehicle's headlights were pointed to a wooded area just north of Bleigh Construction. The vehicle then continued northward on the highway toward Graupman Construction. The vehicle turned around at the southernmost entrance to Graupman, and proceeded back south on Highway 168. The vehicle passed Bleigh Construction and went down to the entrance of Austin Power, just south of Bleigh Construction. The vehicle turned around in the entrance of Austin Power and proceeded back north again. The vehicle repeated its prior actions—as it approached Bleigh Construction, it veered to the left, as though turning into an entrance, and pointed its headlights into the same wooded area. The vehicle then continued north on Highway 168.

At this point, McAfee contacted Deputy Eric Dudley, who was also patrolling in the area, to determine where he was located. Dudley was headed south out of Palmyra on Highway 168, towards the two construction sites, to check on the anhydrous ammonia tanks at Bleigh Construction before heading home for the night. McAfee reported the vehicle's movements to Dudley. Dudley saw the vehicle coming towards him; Dudley and the vehicle passed.

Deputy Dudley turned around and headed back north on the highway to see where the vehicle went. He lost sight of the vehicle as it went around a curve. McAfee reported that the vehicle had turned around at Graupman Construction and was headed back south towards Bleigh Construction. The vehicle and Dudley again passed each other.

---

**2.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**3.** On appeal from a criminal conviction, this Court reviews the facts in the light most favorable to the verdict. *State v. Storey*, 901 S.W.2d 886, 891 (Mo. banc 1995).

Deputy Dudley continued northward to Graupman, where he turned around and proceeded back south on Highway 168. McAfee reported that the vehicle had applied its brakes and had stopped very near the anhydrous tanks at Bleigh Construction. At this point, Dudley advised McAfee and dispatch that he was going to stop the vehicle, to investigate what the vehicle and its occupants were doing and to see if there was an attempt to steal anhydrous ammonia. At this point in time, the suspicious vehicle had driven past Bleigh Construction three times in the span of five minutes. When Dudley came around the curve of the highway, he saw the vehicle stopped at Bleigh Construction, right in front of the anhydrous ammonia tanks. As he approached from behind and his headlights became visible to the stopped vehicle, the vehicle "took off at a high rate of speed." Dudley pursued the vehicle, and as he got closer, he activated his lights and siren. McAfee also left his parked position and pursued the vehicle. The vehicle pulled over at the entrance to Austin Powder.

Deputies Dudley and McAfee parked behind the stopped vehicle; as McAfee exited his patrol car, he could smell the odor of ether. McAfee was parked about twenty feet behind the vehicle; as he approached the stopped vehicle, the odor became stronger.

Defendant was driving the stopped vehicle. There were two passengers in the car—Joseph Tierney and Kris Luoma, the owner of the car.[4] Deputy Dudley asked defendant for his driver's license and asked him to step out of the vehicle. When defendant exited the vehicle, both Dudley and McAfee noticed the smell of ether coming off defendant's person. As explained at the pre-trial suppression

hearing, the odor of ether is significant to police officers because that product is used in the production of methamphetamine. Dudley asked defendant why he smelled like ether. Defendant turned away from Deputy Dudley and said he did not know what the deputy was talking about.

Deputy Dudley asked defendant what he and his passengers were doing. Defendant stated they were just out driving around. Dudley then asked why they stopped by the anhydrous ammonia tanks. Defendant stated they saw some deer in the field, so they stopped and were looking at the deer. Dudley had not seen any deer that night, and although in the past he had seen deer in the general area, he had never seen any deer in the area in front of Bleigh Construction. Dudley then asked defendant if there was anything illegal in the vehicle. Defendant said no, and told the deputy to go ahead and look.

Before searching the car, Deputy Dudley had the passengers step out of the vehicle. In removing the passenger from the back seat, Dudley noticed a fire extinguisher in plain view on top of a speaker box behind the driver's seat. Dudley knew that the extinguisher could be used to steal and carry anhydrous ammonia. The deputy asked defendant about the fire extinguisher. Defendant stated he knew nothing about it. Dudley then remarked that the fire extinguisher could be used to carry anhydrous ammonia, to which defendant stated that if that is what he was doing, "wouldn't I need an inner tube?"

Deputy Dudley obtained permission from Mr. Luoma to search the vehicle. Dudley reached in and grabbed the fire extinguisher. As he did so, he noticed a syringe cap on the back passenger seat. When he picked that up, he noticed a

4. The record is not clear where Tierney and Luoma were seated respectively in the car, except that one of them was in the front passenger seat and the other in the back seat.

syringe on the floorboard. Dudley also seized the syringe. He asked Mr. Tierney to whom the syringe belonged. Tierney said it was his, and that he had used it to ingest methamphetamine. Deputy Dudley placed Mr. Tierney under arrest. The deputy then asked defendant if he had recently used narcotics. Defendant said that he had, a couple of hours earlier.

Deputy Dudley then proceeded to search the trunk. As soon as he opened the trunk, he could smell the odor of ether emanating from the trunk. Inside the trunk, Dudley found a plastic bag containing a HCL generator, which is used in the manufacture of methamphetamine. The generator contained a salt-like substance. As explained at trial, salt is used in the HCL generator during the manufacture of methamphetamine. The deputy also found a pair of bolt cutters in the trunk, right next to the plastic bag. Dudley also found a flashlight, a pair of black gloves, a plastic jug, and a hammer in the car.

After finding the items in the trunk, the deputies arrested defendant and read him his *Miranda* rights. Deputy McAfee transported defendant and his two companions back to the jail. Deputy Dudley remained with the stopped vehicle, to await the arrival of the narcotics task force to process the seized items. After taking the defendant and his companions to jail, McAfee returned to the scene and searched the area where he had observed defendant illuminate the woods with his headlights. He found a five-gallon bucket with a bicycle inner tube inside of it. He also found a large cooler laying at the edge of the woods, about seventy-five to one-hundred feet away from the bucket.

The State charged defendant, as a prior and persistent offender, with attempt to commit the offense of stealing anhydrous ammonia. The case proceeded to a jury trial.

The State presented three witnesses at trial—Deputy McAfee, Deputy Dudley, and Joe Hayes, the officer from the Northeast Missouri Narcotics Task Force who responded to the scene. In addition to eliciting testimony, the State also introduced, and the trial court admitted, a variety of photos of the exterior, interior, and trunk of the car, the syringe, the HCL generator, the fire extinguisher, the gloves, the plastic jug, the cooler, the five-gallon bucket, and the inner tube. The State also introduced, and the court admitted, the actual bolt cutters, the flashlight, the hammer, and the gloves into evidence. Defendant presented two witnesses.

Essentially, the two deputies testified to the events of the evening, as detailed above. Officer Hayes testified regarding the items found in the vehicle. He explained that they found everything one would need to steal anhydrous ammonia from the tanks at Bleigh Construction, and that to do so, one would take the seized fire extinguisher, place it up to the nozzle on the tank, turn the nozzle on, and let the anhydrous ammonia go into the extinguisher. One would use the seized bolt cutters to cut the lock off the tank. He also explained that gloves, while not necessary, would be helpful to protect oneself from the caustic agent. He further explained that a hose or tube is used to transfer anhydrous ammonia from one container to another. He additionally noted that the seized fire extinguisher was found empty and dismantled, with either the top or bottom off, but explained, based on his training and experience, that such an extinguisher could be used to store anhydrous ammonia.

The jury found defendant guilty as charged. Defendant appeals.

### Point I: Sufficiency of the Evidence

The defendant challenges the sufficiency of the evidence in two respects. He first

claims the State presented insufficient evidence to prove that he possessed the equipment to steal anhydrous ammonia. And secondly, defendant asserts there was insufficient evidence to prove that he had taken a substantial step towards stealing the anhydrous ammonia.

"When a criminal defendant challenges the sufficiency of the evidence to support a conviction, this Court's review is limited to determining whether the State introduced sufficient evidence at trial from which a reasonable trier of fact could have found each element of the offense to have been established beyond a reasonable doubt. *State v. Bateman,* 318 S.W.3d 681, 686–87 (Mo. banc 2010). In making this determination, we accept as true all evidence favorable to the verdict, including all favorable inferences drawn from the evidence. *Id.* at 687. We disregard all evidence and inferences contrary to a finding of guilt. *Id.* Additionally, we do not weigh the evidence. *State v. Crawford,* 68 S.W.3d 406, 408 (Mo. banc 2002). The credibility and weight of testimony are for the fact-finder—here the jury—to determine. *Id.* "The fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case." *Id.*

The State charged defendant with attempting to steal anhydrous ammonia. Specifically, the State charged that defendant:

... knowingly possessed equipment which can be used to steal anhydrous ammonia and was in the area where anhydrous ammonia was located, in the early morning hours, and such conduct was a substantial step toward the commission of the crime of stealing anhydrous ammonia, and was done for the purpose of committing such stealing of anhydrous ammonia.

A person commits the crime a stealing if the person "appropriates property or services of another with the purpose to deprive him or her thereof, either without his or her consent or by means of deceit or coercion." Section 570.030.1. A person is guilty of attempt to commit an offense when "with the purpose of committing the offense, he does any act which is a substantial step towards the commission of the offense." Section 564.011.1; *State v. Withrow,* 8 S.W.3d 75, 78 (Mo. banc 1999). To convict defendant here the State had to prove two elements: (1) that defendant had the purpose of committing the underlying offense (stealing anhydrous ammonia); and (2) the doing of an act that constitutes a substantial step toward the commission of that offense. *See Withrow,* 8 S.W.3d at 78–9. The trial court in this case instructed the jury to find defendant guilty of attempting to steal anhydrous ammonia if the jury found, beyond a reasonable doubt:

First, that on or about December 11, 2010, in the Township of Miller, County of Marion, State of Missouri, the defendant possessed equipment which can be used to steal anhydrous ammonia and was in the area where anhydrous ammonia was located, in the early morning hours, and

Second, that such conduct was a substantial step toward the commission of the offense of stealing anhydrous ammonia, from Bleigh Construction Company, and,

Third, that the defendant engaged in such conduct for the purpose of stealing anhydrous ammonia from Bleigh Construction Company.

Defendant challenges the possession and substantial-step elements. We shall discuss each in turn.

*Possession*

■ Defendant contends the State presented insufficient evidence to prove that he possessed the equipment to steal anhydrous ammonia. The State introduced evidence of a number of pieces of equipment, notably: a fire extinguisher, a flashlight, gloves, a plastic jug, a hammer, a bolt cutter, a HCL generator, a five-gallon bucket, a cooler, and a bicycle inner tube. Officers found these items in various locations in and near the car driven by defendant.

Possession may be either actual or constructive. In determining whether the evidence was sufficient to prove that defendant possessed equipment used to steal anhydrous ammonia, this Court applies the same standard of actual or constructive possession as is used in drug-possession cases. *See State v. Mickle,* 164 S.W.3d 33, 42 (Mo.App. W.D.2005). The criminal code of Missouri defines "possess" as "having actual or constructive possession of an object with knowledge of its presence." Section 556.061(22). A person has actual possession if the person "has the object on his or her person or within easy reach and convenient control." Section 556.061(22). Here, in removing one of the passengers from the back seat, Deputy Dudley observed a fire extinguisher in plain view on top of a speaker box immediately behind the defendant's driver's seat. This is sufficient evidence from which a reasonable juror could conclude that the fire extinguisher was within defendant's easy reach and convenient control, and thus that defendant had actual possession of that fire extinguisher. Furthermore, the testimony showed that the fire extinguisher could be used to steal anhydrous ammonia. Deputy Dudley testified that he found the presence of the extinguisher significant because he knew it to be a way to steal and carry anhydrous ammonia. Officer Hayes also testified that the fire extinguisher could be used to store anhydrous ammonia. He specifically noted that one could take the seized fire extinguisher, place it up to the nozzle on the tank, turn on the nozzle and let the anhydrous ammonia go into the fire extinguisher.

■ Defendant's arguments to the contrary are unavailing. Defendant suggests, without citation to any legal authority to support his contention, that it is problematic that the "exact location" of the fire extinguisher cannot be established except by testimony because the pictures admitted at trial do not show the extinguisher in its original location. Defendant's argument goes to the credibility and weight of the evidence, and as such was one to be argued to the jury. Conflicts in the evidence are for the jury to decide. *See, e.g., State v. Davison,* 46 S.W.3d 68, 80 (Mo.App. W.D.2001)(holding conflicts between photograph and witness testimony are questions for jury's resolution)(abrogated on other grounds by *J.C.W. ex rel. Webb v. Wyciskalla,* 275 S.W.3d 249 (Mo. banc 2009)). It is not our function, as a reviewing court, to resolve conflicts in the evidence and decide the credibility of witnesses to determine whether the defendant is guilty beyond a reasonable doubt. *State v. Grim,* 854 S.W.2d 403, 414 (Mo. banc 1993). It is axiomatic that "testimony of a single witness may be sufficient to constitute substantial evidence to make a submissible case." *See, e.g., State v. Ervin,* 835 S.W.2d 905, 921 (Mo. banc 1992). Deputy Dudley's testimony was sufficient evidence to establish where the fire extinguisher was located. Defendant also argues that the fire extinguisher could not have been used to steal anhydrous ammonia because the bottom had been cut away. He contends the opening would render the extinguisher ineffective for containing anhydrous ammonia, and that the inability to

seal the extinguisher tightly would allow the ammonia to burn defendant, and would cause inhalant problems or block defendant's lungs. Thus, he asserts that the extinguisher was not equipment that could be used to steal anhydrous ammonia. Again, this argument goes to the credibility of the evidence and the different inferences to be drawn from that evidence. This is a matter for cross-examination and argument to the jury. The officers testified that the extinguisher could be used to steal anhydrous ammonia, and the jury was free to credit that testimony.

We hold that there was sufficient evidence from which the jury could find that defendant, being in actual possession of the fire extinguisher, possessed the equipment to steal anhydrous ammonia. Although this is dispositive of defendant's point, we nevertheless address the other items introduced by the State. Those other items were found either in the back seat of the car, in the trunk of the car, or in the nearby wooded area. The State adduced testimony showing that these items could be used to steal anhydrous ammonia. In particular, Officer Hayes testified that the bolt cutters could be used should there be a lock on the anhydrous ammonia tank. The gloves could be used to protect ones hands from the caustic agent. A hose or tube would be used to transfer the anhydrous ammonia from one container to another. The testimony does not readily disclose that these items were within defendant's easy reach, such that the defendant had actual possession, and the State makes no such contention. Therefore we examine this evidence to determine if there was sufficient evidence to prove that defendant constructively possessed the items.

A person has constructive possession if one "has the power and the intention at a given time to exercise dominion or control over the object either directly or through another person or persons." Section 556.061(22). "Constructive possession requires, at a minimum, evidence that the defendant had access to and control over the premises where the materials were found." *Withrow*, 8 S.W.3d at 80. "Exclusive possession of the premises containing the materials raises an inference of possession and control." *Id.* Here, however, defendant did not have exclusive control of the premises since he was neither the owner nor the sole occupant of the car. Rather the car defendant was driving was jointly occupied by defendant and two of his companions, one of whom owned the car. In cases involving joint control of an automobile such as this, further evidence is needed to connect the defendant to the items before it can be said that he possessed those items. *See Id.*; *State v. Woods*, 284 S.W.3d 630, 639 (Mo.App. W.D.2009). Additional facts must buttress the inference that the defendant knew of the presence of the items. *State v. Meanor*, 863 S.W.2d 884, 889 (Mo. banc 1993); *see also Withrow*, 8 S.W.3d at 80; *State v. Wood*, 301 S.W.3d 578, 584 (Mo.App. S.D.2010). "In cases involving joint control of an automobile ... a defendant is deemed to have both knowledge and control of the items discovered within the automobile, and, therefore, possession in the legal sense, where there is additional evidence connecting him with the items." *State v. Mickle*, 164 S.W.3d 33, 43 (Mo.App. W.D.2005). Additional incriminating circumstances that will support an inference of knowledge and control in a joint-control case include: the defendant's easy accessibility or routine access to the items; the defendant's close proximity to the items; finding defendant's personal belongings with the items; defendant's close proximity to the items in plain view of the police; the odor of drugs, or the presence of a chemical odor; admissions

by the defendant; and conduct by defendant indicating a consciousness of guilt such as making false statements in an attempt to deceive the police, nervousness during the search, and flight from law enforcement. *Woods*, 284 S.W.3d at 640; *Mickle*, 164 S.W.3d at 43–44; *State v. Farris*, 125 S.W.3d 382, 388 (Mo.App. W.D. 2004). We consider the totality of the circumstances in determining whether the evidence of additional incriminating circumstances sufficiently supports an inference of knowledge and control. *Farris*, 125 S.W.3d at 388.

Here, defendant was driving the car. He thus had the keys to the car. The jury could reasonably infer that either defendant had a key to open the trunk, or that he was near an interior release latch. Either inference demonstrates that he had the access to and control over the items in the car and trunk. The State also presented evidence of other incriminating circumstances linking defendant with the items and supporting an inference of knowledge and control. The close proximity of defendant to the items in the car, while alone insufficient to establish possession, is a circumstance that supports an inference of possession. *Id.* at 388. Defendant was driving back and forth, in front of the storage tank, during the early morning hours. Defendant stopped and illuminated the wooded area near the tank with his headlights. Officers later found an inner tube in that wooded area where defendant had pointed his headlights. The tube could be used to transfer the anhydrous ammonia from one container to another. After driving back and forth several times, defendant ultimately stopped in front of the storage tank, and then sped away at a high-rate of speed when Deputy Dudley approached. The jury could reasonably infer from defendant's conduct that he was not deer-watching, as he pro-

tested, but rather that he was engaged in less-than-innocent activity. Also, defendant admitted to using drugs earlier in the evening. The officers smelled ether on defendant, as well as emanating from the trunk. When asked why he smelled of ether, defendant turned away from Deputy Dudley and said he didn't know what he was talking about. A strong smell of ether is incriminating evidence of possession. *Id.* The jury could properly find defendant's statement not credible and infer that he was aware of the presence of the ether because of the unmistakably strong odor. *Id.* Further, the jury could infer consciousness of guilt from several circumstances: the defendant's false statement to the officers about whether he smelled of ether; the defendant's speeding away from the scene at a high rate of speed; and the defendant's remarks concerning the fire extinguisher. *See Id.* (false statements); *see Woods*, 284 S.W.3d at 640 (flight). When responding to Deputy Dudley's inquiry about his possession of the fire extinguisher, defendant denied knowing anything about it, but then stated that if he was stealing anhydrous ammonia, he would need a tube to do that. The jury could conclude that defendant's statement was indicative of his knowledge that he had at least some of the equipment necessary to steal that ammonia.

The individual circumstances may appear innocent in isolation. However, we do not view the evidence in a vacuum. Rather, we examine the totality of the circumstances, and after doing so, we conclude that the State presented sufficient evidence of additional incriminating circumstances to reasonably permit the inference that defendant had knowledge of, and control over, the equipment located in the back seat and trunk of the car. Therefore, the evidence was sufficient to make a submissible case that defendant constructively possessed those items. And, as detailed

above, there was sufficient evidence from which the jury could find that defendant was in actual possession of the fire extinguisher. Thus, we hold that the State presented sufficient evidence from which the jury could find that defendant possessed the equipment to steal anhydrous ammonia. We deny this portion of defendant's point.

*Substantial Step*

Defendant also contends the evidence was insufficient to prove that he had taken a substantial step towards stealing the anhydrous ammonia. A "substantial step" is conduct that is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense. Section 564.011.1;[5] *Withrow*, 8 S.W.3d at 78; *State v. West*, 21 S.W.3d 59, 64 (Mo.App. W.D.2000). The act or conduct that will fulfill the substantial-step requirement depends on the facts of the particular case. *State v. West*, 21 S.W.3d 59, 64 (Mo.App. W.D.2000).

Defendant cites *State v. Kusgen*, 178 S.W.3d 595 (Mo.App. W.D.2005). In *Kusgen*, officers observed a car driving on a highway at about midnight. The driver of the car slammed on the brakes as the car passed a facility that stored anhydrous ammonia. Two people exited the vehicle and headed out across a cornfield that bordered the facility. For the next twenty minutes the two slowly and methodically moved across the cornfield toward the ammonia tanks, attempting to conceal themselves as they went. The two stopped and turned around only when they reached a point from where the patrol car would have been visible. The officers found defendant Kusgen about two-hundred feet from the property, curled up in a ball, hiding in the grass, wearing camouflage clothing and rubber gloves, and in possession of a flashlight wrapped in black electrical tape, which had apparently been done to dim the light so that it would be less detectable. Kusgen told the officers that he was coon hunting in the cornfields. He also stated he was searching for his dog. The defendant did not have a gun with him to use in hunting, and at no time during the evening had officers heard or seen a dog. The officers later found plastic jugs and a garden hose about one-hundred yards north of the property. *Kusgen*, 178 S.W.3d at 598–99.

---

**5.** Section 564.011 was enacted in 1977 and became effective January 1, 1979, as part of Missouri's new criminal code. Comments to the proposed new code noted the difficulties in explaining what is meant by a "substantial step," and then explained:

What act will constitute a substantial step will depend on the facts of the particular case. If the other requirements of attempt liability are met, the following, if strongly indicative of the actor's criminal purpose, should not be held insufficient as a matter of law:

(a) lying in wait, searching for or following the contemplated victim of the offense.

(b) enticing or seeking to entice the contemplated victim of the offense to go to the place contemplated for its commission.

(c) reconnoitering the place contemplated for the commission of the offense.

(d) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the offense will be committed.

(e) possession of materials to be employed in the commission of the offense, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances.

(f) possession, collection or fabrication of materials to be employed in the commission of the offense, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances.

(g) soliciting an agent, whether innocent or not, to engage in conduct constituting an element of the offense or an attempt to commit such offense or which would establish the agent's complicity in its commission or attempted commission.

The Court held a reasonable juror could have concluded beyond a reasonable doubt that Kusgen had taken a substantial step indicating firmness of purpose in stealing anhydrous ammonia in his attempt to commit that offense. *Id.* at 601. The Court found that the discovery of the plastic jugs and the garden hose along with the camouflage clothing, the rubber chemical gloves, the flashlight wrapped in electrical tape, the surreptitious conduct and implausible explanation all demonstrated firmness of purpose to complete the theft. *Id.* at 599. The Court further found that even though Kusgen did not reach the property before aborting the mission, the jury was entitled to conclude that Kusgen's decision to approach the tanks with the items necessary to steal anhydrous ammonia showed a firmness of intent to complete the theft and that it was only the fact that Kusgen and his companion saw the patrol car that caused them to abort their mission. *Id.* at 599–600.

Defendant here contends the evidence was insufficient because unlike the scenario in *Kusgen*, no one exited the vehicle. Defendant notes that the car he was driving remained on the highway at all times, that there was no way to access the tanks at Bleigh Construction by vehicle, and that he had nothing on his person. Defendant further notes alleged inconsistencies in Deputy Dudley's testimony about whether he had to chase defendant. Defendant implies that no chase occurred and that he immediately pulled over after Deputy Dudley activated his lights and siren.[6]

Defendant's argument and his reliance on *Kusgen* are unavailing. The factual differences between his case and *Kusgen* are of no moment. Moreover, as above, defendant ignores our standard of review, and argues different inferences from the evidence. Again, on review we disregard all evidence and inferences that are contrary to a finding of guilt. Our inquiry is

---

**6.** Defendant misrepresents Deputy Dudley's testimony.

Defendant asserts that Deputy Dudley's testimony was inconsistent. Of course, any perceived inconsistencies in testimony is for the finder of fact to resolve. Defendant's assertion demands our further attention, however, because we find no inconsistency in the testimony.

Defendant claims that Deputy Dudley's testimony at trial—that he chased defendant—is inconsistent with the deputy's testimony at the suppression hearing, where he testified that there was no chase and that the defendant immediately pulled over when he activated his lights and siren. This is cherry-picking at best.

Defendant fails to give a complete account of Deputy Dudley's testimony—either from trial or from the suppression hearing.

Deputy Dudley testified at the suppression hearing to the following sequence of events: he approached defendant's car from behind; when he was at a point where defendant would see his headlights, defendant took off at a high rate of speed; he chased defendant for a few hundred yards; when he got closer to the defendant, he activated his lights and sirens, and defendant pulled over; there was no chase after he activated his lights. The deputy testified at trial to the same, exact sequence of events.

Defense counsel attempted to impeach Deputy Dudley on cross-examination with the notion that the deputy's testimony was inconsistent. The deputy rejected this notion, and then reiterated and clarified his testimony. He explained that when he pulled up behind defendant, defendant took off at a high-rate of speed, and that he "chased" defendant, meaning to catch up with him. He further explained that once he caught up with defendant, he activated his lights and siren, and the defendant pulled over. There was no chase after he activated his lights and siren. Despite defendant's representations and protestations to the contrary, the deputy's accounts were entirely consistent.

We also note that defendant, on more than one occasion, represents that Deputy Dudley activated his lights and siren before defendant sped off. This is contrary to the testimony. The testimony is clear—Deputy Dudley activated his lights and siren after defendant sped away—not before.

whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found, beyond a reasonable doubt, that defendant took a substantial step towards the commission of the crime. And here we answer that question in the affirmative. Defendant, in the early morning hours, repeatedly drove his vehicle back and forth in front of the property where the anhydrous ammonia tanks were located. On at least two of those passes, defendant stopped, angled his car, and pointed his headlights into a wooded area near the tanks. Defendant eventually parked his vehicle immediately in front of the tanks. He took off at a high rate of speed when Deputy Dudley approached, which is indicative of a consciousness of guilt. Defendant had equipment in the car that could be used for stealing anhydrous ammonia. Additional equipment was located in the wooded area that defendant had illuminated with his headlights. The jury could have reasonably concluded that defendant's conduct was "strongly corroborative" of his intent to engage in illegal activity, and that the only reason defendant and his companions did not get closer to the anhydrous ammonia tanks was because law enforcement interrupted their endeavor. We hold there is sufficient evidence from which the jury could find that defendant had taken a substantial step toward the theft of anhydrous ammonia.

Accordingly, the trial court correctly overruled defendant's motion for judgment of acquittal. We deny this point.

### Point II: Mistrial for Testimony Regarding Defendant's "Past"

The defendant next alleges the trial court abused its discretion in denying a mistrial based upon Deputy Dudley's testimony that he knew defendant's "past" and that he "should have asked" defendant if he had used methamphetamine.[7] Defendant contends the deputy's answer was non-responsive to the question posed to him, and that it was intended to inform the jury of his past methamphetamine usage and/or convictions in order to bolster the State's case. He insists the testimony runs afoul of the general rule prohibiting evidence of uncharged misconduct.

During direct examination by the prosecutor, Dudley related that he had asked defendant if he had recently used narcotics, to which defendant responded that he had, a couple of hours earlier. In apparent response to this testimony, defense counsel on cross-examination elicited testimony from Dudley that he had not observed any signs of intoxication, and that he had no reason to believe that defendant was high except the fact that defendant said he had used drugs earlier that night. The following exchange between defense counsel and Deputy Dudley then took place:

Q. But according to you, he told you he had done drugs before? Earlier? Earlier that day?

A. Correct.

Q. But exhibited no signs?

A. Correct.

Q. Okay. And you didn't ask—you didn't specify what kind, you just said drugs; is that right?

A. *I don't know if I asked him because I know his past so I could have asked him if it was methamphetamine or not,* I don't recall.

---

7. Defendant again misstates Deputy Dudley's testimony. The deputy never testified that he *"should* have asked" defendant if he had used methamphetamine. Rather, the deputy stated he *"could* have asked" defendant if he had used methamphetamine. (Emphases added).

Q. Okay. Well—

A. I believe I just said narcotics.

Q. You said narcotics?

A. I believe so.

(Emphasis added).

■■■ Defendant did not preserve this issue for our review. Defendant presents this as a matter of the court's ruling on his motion for mistrial, but at heart this is an evidentiary question. In order to preserve an evidentiary question for appellate review, a party must object at the first opportunity. *State v. Ballard*, 6 S.W.3d 210, 213 (Mo.App. S.D.1999) This so-called "contemporaneous objection" rule exists to ensure the integrity of Missouri's criminal process. *Id.* Defendant did not object at the time Deputy Dudley made his statement about the defendant's past. Defendant did not raise an objection until the court's next recess, when counsel was in chambers with the judge, after the deputy had completed his testimony and had been excused, and the State had rested its case. Defendant's belated request for a mistrial was untimely and did not preserve his claim of trial-court error for our review. Any review is for plain error only, at our discretion. *Id.* at 214; *see also Foster v. State*, 348 S.W.3d 158, 163 (Mo.App. E.D. 2011). Because the State also requested a mistrial, we have elected to exercise our discretion to review this point.

■■■ Rule 30.20 authorizes this Court, in our discretion, to review for plain errors affecting substantial rights. We will only grant relief under plain-error review when an alleged error so substantially affects a defendant's rights that a manifest injustice or miscarriage of justice inexorably result if left uncorrected. *Id.* Appellate courts use the plain-error rule sparingly and limit its application to those cases where there is a strong, clear demonstration of manifest injustice or miscarriage of justice. *Ballard*, 6 S.W.3d at 214.

■■■ A mistrial is a drastic remedy warranted only by the most compelling of circumstances. *Id.* The declaration of a mistrial should be made "only in those extraordinary circumstances in which the prejudice to the defendant cannot be otherwise removed." *State v. Johnson*, 901 S.W.2d 60, 62 (Mo. banc 1995). "Ordinarily, the court cures errors in the admission of testimony by instruction the jury to disregard the offending testimony, rather than by declaring a mistrial." *State v. Kalagian*, 833 S.W.2d 431, 435 (Mo.App. E.D.1992).

■■■ Generally, evidence of uncharged crimes, wrongs, or act is inadmissible for the purpose of showing the propensity of the defendant to commit such crimes. *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993). There are exceptions to this rule. *Id.* Evidence of prior bad acts, although not admissible to show propensity, may be admissible to show motive, intent, absence of mistake, the existence of a common scheme or plan, or the identity of the person being charged with the commission of the crime. *State v. Primm*, 347 S.W.3d 66, 70 (Mo. banc 2011). Additionally, "evidence of uncharged crimes that are part of the circumstances or the sequence of events surrounding the offense charged may be admissible to present a complete and coherent picture of the events that transpired." *Id.* (internal quotation omitted). "The offered evidence must be both logically relevant, in that it has some legitimate tendency to establish the guilt of the accused for the charges for which he is on trial, and also legally relevant, in that its probative value outweighs its prejudicial effect." *State v. Winfrey*, 337 S.W.3d 1, 11 (Mo. banc 2011).

We do not decide if the deputy's testimony constituted inadmissible evidence of prior bad acts, or if it did, whether the testimony falls within one of the numerous exceptions allowing admission of that testimony. For even if the testimony constituted inadmissible evidence, not within any exception, we nevertheless find no error on the part of the trial court in refusing to grant a mistrial. To receive relief under plain-error review, the defendant must demonstrate manifest injustice—a higher bar than prejudice—and here, defendant cannot even show prejudice. In determining the prejudicial effect of an uninvited reference to other crimes, Missouri courts generally examine the following five factors: (1) whether the statement was, in fact, voluntary and unresponsive to the prosecutor's questioning or caused by the prosecutor; (2) whether the statement was singular and isolated, and whether it was emphasized or magnified by the prosecution; (3) whether the remarks were vague and indefinite, or whether they made specific reference to crimes committed by the accused; (4) whether the court promptly sustained defense counsel's objection to the statement, and instructed the jury to disregard the volunteered statement; and (5) whether, in view of the other evidence presented and the strength of the State's case, it appeared that the comment played a decisive role in the determination of guilt. *State v. Goff,* 129 S.W.3d 857, 866 n. 7 (Mo. banc 2004).

Of course, the trial court is in the best position to assess the prejudicial effect of the complained-of testimony, but here, we discern no prejudice. The complained-of comment was not caused or elicited by the prosecutor. Rather, it came in response to defense counsel's question on cross-examination. The comment was singular and isolated. In fact, defense counsel himself, in explaining why he belatedly objected, stated that he "didn't catch it" until he reviewed the transcript. If defense counsel did not "catch" the response to his own question, how can we conclude that the jury did? The prosecutor did not emphasize or magnify the statement. The trial court instructed the jury to disregard the statement with an admonition that was crafted by all parties, including defense counsel. Any prejudicial effect can be removed by striking the testimony and instructing the jurors to disregard it. *Foster,* 348 S.W.3d at 163. And, absent a showing to the contrary, we presume the jurors followed the court's instruction. *State v. Stone,* 280 S.W.3d 111, 117 (Mo. App. E.D.2009); *State v. Barton,* 240 S.W.3d 693, 703 (Mo. banc 2007); *State v. Brasher,* 867 S.W.2d 565, 569 (Mo.App. W.D.1993). Lastly, we cannot say that the response played a decisive role in the determination of guilt. The jury already knew that defendant had used drugs earlier that evening; the defendant's actions that night were indicative of a consciousness of guilt; and the defendant possessed equipment for stealing anhydrous ammonia.

In sum, we hold that the trial court did not plainly err in overruling defendant's belated request for a mistrial. We deny this point.

### Point III: Admission of Testimony Regarding Text Messages

Next, defendant maintains that testimony regarding text messages in his phone was inadmissible. Deputy Dudley testified that at some point during the stop, he asked to look at defendant's cell phone. Defendant consented and gave the deputy his phone. Dudley testified that he found two text messages in the phone. One said: "Dude, after I see you, I'm going to go get five gallons. I haven't been spun in five

weeks." Dudley explained that "spun" is street lingo for being high. The other message said: "You want me to juice tonight?" According to Dudley, this is street lingo for stealing anhydrous ammonia. Defense counsel objected, arguing that the State had not laid a proper foundation for the testimony. The trial court sustained the objection and admonished the jury to disregard the evidence, although not contemporaneously with defendant's objection.

■ The defendant asserts the trial court erred in allowing Deputy Dudley to testify to the content of two text messages in his cell phone because: (1) the State did not establish a foundation for admission of the messages; (2) the testimony violated the best-evidence rule; and (3) the text messages constituted inadmissible hearsay.

We do not reach defendant's best-evidence and hearsay claims because he did not preserve those issues for our review. In objecting at trial, the defendant stated he was objecting on best-evidence grounds, but he advanced no argument in support of that ground. Rather, he solely argued, extensively so, that the State had not laid a proper foundation for the testimony. And, defendant has advanced no argument on appeal in support of his contention that the deputy's testimony violated the best-evidence rule. Accordingly, we hold that defendant has abandoned the issue. *State v. Nunley*, 341 S.W.3d 611, 623 (Mo. banc 2011)(holding "[a]rguments raised in the points relied on portion of an appellate brief that are not supported in the argument portion of the brief are deemed abandoned and preserve nothing for appellate review."); *accord State v. Greenlee*, 327 S.W.3d 602 (Mo.App.E.D.2010). As to defendant's hearsay claim, he did not lodge a hearsay objection at trial, and thus his claim is not properly before us. *State v. Johnson*, 207 S.W.3d 24, 43 (Mo. banc

2006)(holding "a point is preserved for appellate review only if it is based on the same theory presented at trial; an appellant cannot broaden the scope of his objections on appeal beyond that made in the trial court"); *State v. Thompson*, 341 S.W.3d 723, 728 (Mo.App. E.D.2011)(holding "the grounds for alleged trial-court error asserted on appeal are limited to those stated at trial"). Furthermore, defendant's argument on appeal is conclusory at best, and he cites no authority in support of his argument. Thus, we hold that he has also abandoned this issue. *State v. Edwards*, 280 S.W.3d 184, 190 (Mo.App. E.D.2009)(holding that where a party fails to support a contention with relevant authority or argument beyond conclusions, the point is considered abandoned).

■ This leaves defendant's contention that the trial court erred in admitting the deputy's evidence because the State failed to establish a foundation. Defendant's claim fails, however, because the trial court granted all the relief requested, and there is no adverse ruling for our review. *State v. Perriman*, 352 Mo. 1022, 180 S.W.2d 668, 679–70 (1944). Defendant objected to the admission of the text messages based upon a lack of foundation. The trial court ultimately sustained defendant's objection. Defendant did not object to the lateness of the court's ruling. Indeed, defense counsel was satisfied with the court's ruling, stating, "we don't object to the sustaining of the defense motion."

■ The court admonished the jury to "disregard the evidence of text messages on the cell phone." Defendant lodged no objection, at trial or now on appeal, regarding the wording of the admonition. He lodged no complaint at trial, as he does now on appeal, that the admonition was "too little, too late." Moreover, as we noted above, absent a showing to the contrary, we presume that jurors follow the

court's instructions. *Stone*, 280 S.W.3d at 117; *Barton*, 240 S.W.3d at 703; *Brasher*, 867 S.W.2d at 569. Defendant advanced no argument and made no showing to the contrary. We deny this point.

### Point IV: Reasonable Suspicion Justifying Stop of Defendant's Vehicle

Defendant next alleges the trial court erred and abused its discretion in overruling his motion to suppress and in overruling his objection to the admission of evidence of the items seized from the vehicle. Defendant contends there was no reasonable suspicion for the stop of the vehicle, as the State did not establish any specific, articulable facts that those stopped were engaged in criminal activity, and no crime or traffic violation had been committed prior to the stop. Defendant maintains the stop was unlawful, and therefore the trial court should have excluded evidence of the items seized as a result of that stop.

 We will affirm the trial court's ruling on a motion to suppress evidence unless that ruling is clearly erroneous. *State v. Ashby*, 339 S.W.3d 600, 603 (Mo. App. E.D.2011). We consider the evidence presented at both the suppression hearing and at trial. *State v. Grayson*, 336 S.W.3d 138, 142 (Mo. banc 2011). And we consider that evidence in the light most favorable to the trial court's ruling and disregard contrary evidence and inferences. *Ashby*, 339 S.W.3d at 603–4; *see also State v. Pike*, 162 S.W.3d 464, 473 (Mo. banc 2005). We review the factual findings only to determine if they are supported by substantial evidence. *Grayson*, 336 S.W.3d at

142. We review *de novo* the legal determination of whether reasonable suspicion existed. *Id.* (citing *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)). We hold there was sufficient reasonable suspicion to justify the stop.

The Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[8] U.S. Const. amend. IV. The Fourth Amendment "contains no provision expressly precluding the use of evidence obtained in violation of its commands." *Arizona v. Evans*, 514 U.S. 1, 10, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). Nevertheless, judicial decisions have established an exclusionary rule that, when applicable, forbids the use at trial of evidence obtained as a result of a Fourth Amendment violation. *Herring v. U.S.*, 555 U.S. 135, 139, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). This judicially-created remedy is designed "to safeguard Fourth Amendment rights generally through its deterrent effect...." *U.S. v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

 Generally, a search or seizure is allowed only if the police have probable cause to believe the person has committed or is committing a crime. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *State v. Miller*, 894 S.W.2d 649, 651 (Mo. banc 1995). However, the Fourth Amendment also allows police officers to make a brief, investigatory stop if the officer "observes unusual conduct

8. The prohibition of the Fourth Amendment against unreasonable searches and seizures applies to the states through the due-process clause of the Fourteenth Amendment. *State v. Ross*, 254 S.W.3d 267, 273 (Mo.App. E.D. 2008); *State v. Goff*, 129 S.W.3d 857, 862 (Mo. banc 2004). Further, Missouri's constitutional protection against unreasonable searches and seizures, found in Article I, Section 15 of the Missouri Constitution, is coextensive with that provided by the Fourth Amendment of the United States Constitution. *Ross*, 254 S.W.3d at 273; *State v. Pike*, 162 S.W.3d 464, 472 (Mo. banc 2005).

which leads him reasonably to conclude in light of his experience that criminal activity may be afoot...." *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Goff*, 129 S.W.3d at 862. Such a stop, often referred to as a *"Terry* stop," applies to stops of both individuals and automobiles. *United States v. Brignoni–Ponce*, 422 U.S. 873, 881–82, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Goff*, 129 S.W.3d at 862. To conduct a *Terry* stop, the police must have "reasonable suspicion supported by articulable facts that those stopped are engaged in criminal activity." *Goff*, 129 S.W.3d at 862 (internal quotation omitted). "An officer need not be certain that criminal conduct is taking place; the officer needs merely to have reasonable suspicion of criminal activity." *Goff*, 129 S.W.3d at 864 (citing *United States v. Sokolow*, 490 U.S. 1, 9–10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)). While "reasonable suspicion" is a less demanding standard than probable cause, the Fourth Amendment requires "at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). The officer must be able to articulate more than an "inchoate and unparticularized suspicion or hunch of criminal activity." *Id.* at 123–24, 120 S.Ct. 673. Whether a stop was made based on reasonable suspicion is dependent upon the totality of the circumstances. *Goff*, 129 S.W.3d at 863.

▆▆▆▆ Defendant correctly argues that an individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. *Wardlow*, 528 U.S. at 124, 120 S.Ct. 673. Here, though, it was not merely defendant's presence in a high-crime area at night that aroused the deputies' suspicions. The deputies observed defendant's vehicle driving back and forth

at least three times in the span of five minutes in front of Bleigh Construction, where anhydrous ammonia was stored. During at least two of these passes, the vehicle veered, as though it was attempting to turn into a field entrance, and pointed its headlights into a wooded area near the tanks. Thefts of anhydrous ammonia from this location were common, which is why the deputies were patrolling the area. Officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation; thus, the fact that the stop occurred in a "high-crime area" is one of the relevant contextual considerations in a *Terry* analysis. *Id.* The defendant was out driving between 1:00 and 1:30 in the morning. No one was supposed to be at the construction site at that hour. Officers can consider the lateness of the hour in determining whether criminal activity was afoot. *Goff*, 129 S.W.3d at 864. After repeatedly driving back and forth on the highway in front of the construction site, defendant stopped the car right in front of the anhydrous ammonia tanks. When Deputy Dudley came up behind defendant's vehicle, defendant's car "took off at a high rate of speed." "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Wardlow*, 528 U.S. at 124, 120 S.Ct. 673.

▆▆▆▆ In contending the trial court should have suppressed the evidence, defendant notes that the deputies could not articulate any specific laws or traffic laws that he had violated. However, a traffic violation "is not required to create reasonable suspicion to justify a stop; justification may be based on erratic or unusual operation." *Pike*, 162 S.W.3d at 473.

We hold that the deputies were justified in suspecting that defendant was involved. in criminal activity, and, therefore, in investigating further. The stop was constitutionally valid and the trial court, therefore, did not err in denying defendant's motion to suppress, or in overruling defendant's trial objection to the admission of the evidence. We deny this point.

### Point V: Pre–Miranda Statement

■ The defendant lastly alleges the trial court abused its discretion in admitting his pre-*Miranda* statement to law enforcement officers into evidence. He claims he was prejudiced by his statement that he had used drugs earlier that day. We deny this point because defendant did not preserve this issue for our review.

■ Defendant filed a motion to suppress prior to trial, objecting to the admission of his statement as being the result of an unlawful, pre-*Miranda*, custodial interrogation. The trial court denied this motion. As noted above, this Court will reverse the trial court's ruling on a motion to suppress only if that ruling is clearly erroneous. *Edwards*, 280 S.W.3d at 188. However, "when attacking the validity of the admission of evidence to which a motion to suppress evidence was directed, the question to which the motion was directed must be kept alive by asserting a timely objection to its admission at trial and by raising the matter in a motion for new trial." *Id.* (internal quotation omitted). A ruling on a motion to suppress is interlocutory, and thus subject to change during trial. *Id.* Thus, when a pretrial motion to suppress evidence is denied and the evidence is later offered at trial, the defendant must renew the motion or make a specific objection when the evidence is offered at trial to preserve the issue for appellate review. *Id.*

Defendant objected at trial when the prosecutor asked the law-enforcement officer about defendant's statement. However, the basis of defendant's objection was not that set forth in his motion to suppress. Rather, defendant objected on grounds set forth in his seventh motion *in limine*. Defendant expressly referenced that motion and then argued, as he did in the motion *in limine*, that the statement was inadmissible because he was not facing a drug charge and did not appear "high." Thus, he contended the testimony of his prior drug use lacked probative value and was, instead, highly prejudicial. Defendant did not mention or renew his motion to suppress, nor argue that the statement was inadmissible because it was the result of an unlawful, pre-*Miranda*, custodial interrogation. Thus, defendant did not preserve the issue of a *Miranda* violation for our review. Defendant has not asked for, and we decline to exercise our discretion to review for plain error. We deny this point.

We affirm the judgment of conviction.

KATHIANNE KNAUP CRANE, P.J., and KENNETH M. ROMINES, J., concur.