

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | WD78713 |
| v. | ) | |
| | ) | OPINION FILED: |
| | ) | October 11, 2016 |
| WESLEY WILLIAM OSBORN, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Clay County, Missouri
The Honorable Larry D. Harman, Judge**

**Before Division Two:** Karen King Mitchell, Presiding Judge, and
Cynthia L. Martin and Gary D. Witt, Judges

Wesley Osborn appeals, following a bench trial, his convictions of unlawful possession of

an explosive weapon, § 571.020,[1] and failure to appear, § 544.665, for which he was sentenced to

consecutive terms of six years and three years, for a total sentence of nine years' imprisonment.

Osborn brings six points on appeal, collectively challenging: (1) the trial court's refusal to accept

his guilty plea to failure to appear; (2) the sufficiency of the evidence supporting both convictions;

---

[1] All statutory references are to the Revised Statutes of Missouri, as updated through the 2015 Cumulative
Supplement.

and (3) the trial court's determination that Osborn was competent to stand trial. Finding no error, we affirm.

## Background

On June 13, 2013, at 7:17 a.m., Kansas City police officer Richard Burnett received a "check the welfare" dispatch call to Osborn's residence in Clay County. Burnett arrived with a sergeant and two other officers. They knocked on the front door several times with no response. At one point, they heard movement in the garage, which—along with information from a neighbor indicating they had seen someone in the driveway moments earlier—caused them to believe that someone was present inside. The officers "backed off" and initiated an "Operation 100." An Operation 100 is initiated when the officers believe someone is inside a house who presents a danger to either himself or others. A tactical team arrived, along with a negotiator to speak with the person inside.

After the negotiator arrived, he spoke off-and-on with Osborn for approximately one hour. During the various conversations, Osborn indicated that there was "stuff" inside the residence, which he described as a clay-type material that he believed was an explosive. Osborn advised that it was inside a Ziploc bag, underneath the microwave stand, located in the living room. For the first thirty-five minutes of the conversation, Osborn denied being in the house; he claimed he was elsewhere and talking with the negotiator by cell phone. But at least one woman had left the house during the conversation, and she advised officers that Osborn was inside.[2] At one point, Osborn expressed frustration that police officers had surrounded his home. When asked why it mattered since he was not home, Osborn admitted that he was inside the house.

_____

[2] Osborn later identified the woman as Trina Harvey and advised officers that she had no knowledge of the explosive substance.

2

Osborn eventually came out of the house, and when he did so, Sergeant Daniel Merrit of the Bomb and Arson Section asked Osborn if there were any explosives or booby traps inside the residence. Osborn stated, "I don't want anybody to get hurt. The only thing that could be explosives would be something in a teddy bear that a girl brought over."

When investigators entered Osborn's home, they found a teddy bear on the north end of the garage, sitting on top of an I-beam. Next to the teddy bear was a Ziploc bag containing a substance that was later determined to be a nitrate explosive. On the packaging were the words, "Dyna Nobel," an explosives manufacturer. And testimony at trial indicated that the particular kind of explosive found in the bag was typically used for bore blasting in construction projects, and it could not be obtained legally without a permit.

After Osborn was taken into custody, he was read his *Miranda*[3] warnings, and he agreed to speak with Detective James Keller. Osborn indicated that, a couple of weeks earlier, he had been the target of a shooting in retaliation for information he had provided to the police. The shooting left Osborn in an extreme state of anxiety and nervousness, and it caused him to fear for his life. Osborn was looking for a form of protection, but decided against obtaining a firearm because he knew he could not legally possess one in light of his prior felony convictions. Osborn said that his live-in girlfriend Angela Guterri brought home some "C-4" less than two days after the shooting in response to Osborn's concerns. When she brought it home, Guterri warned Osborn to be careful with the substance, implying it to be dangerous. Osborn indicated that Guterri told him the substance could be detonated remotely with a cell phone and he could use it "to kill these guys." Osborn admitted to handling the substance on multiple occasions. Osborn also indicated that he believed the substance to be a real explosive.

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Osborn was charged with one count of unlawful possession of an explosive weapon. He had a preliminary hearing set for February 21, 2014, for which he failed to appear. A warrant was issued for his arrest, and he was subsequently indicted for both unlawful use of a weapon and felony failure to appear.

Osborn initially reached a plea agreement with the State whereby he would plead guilty to failure to appear in exchange for the State's dismissal of the unlawful possession of an explosive weapon charge. During the plea hearing, however, after the State recited the factual basis for the plea, the court asked Osborn if what the State had indicated was true. Osborn stated that he did not purposely fail to appear; instead, he claimed that he overslept and inadvertently missed the preliminary hearing. In response, the court advised Osborn, "I cannot accept a plea of guilty to this particular charge." Osborn subsequently filed a written waiver of his right to a jury trial and asked to try the case before the court.

At trial, Osborn testified in his own defense, advising the court that Guterri brought the substance into his home of her own volition; that he initially didn't believe it was an explosive; that he never intended to hurt anyone or create a weapon; and that he overslept the day of his preliminary hearing and immediately contacted his bondsman upon discovering his error. Osborn also presented testimony from his bondsman, who verified that Osborn called him the day of the preliminary hearing to report that he had not shown up for the hearing.

The trial court found Osborn guilty of both offenses and sentenced him to consecutive terms of six and three years' imprisonment. Osborn appeals.

**Analysis**

Osborn brings six points on appeal. The first point claims plain error in the trial court's refusal to accept his guilty plea to failure to appear. The second through fourth points challenge the sufficiency of the evidence to support the unlawful possession of an explosive weapon

4

conviction. The fifth point challenges the sufficiency of the evidence to support the failure to appear conviction. And the final point argues that the trial court plainly erred in finding Osborn competent to stand trial. For ease of discussion, we address Osborn's sixth point first.

**A. There was nothing presented during Osborn's criminal proceedings to suggest to the court that it should question Osborn's competence to proceed.**

In his sixth point, Osborn claims that the trial court "plainly erred in finding Osborn competent to stand trial, because Section 552.020 requires that the trial court order (upon its own motion) an evaluation of a criminal defendant when the trial court has reasonable cause to suspect that the defendant lacks mental fitness to proceed." Osborn argues that his competency was called into question by documents filed by his counsel with the court and by counsel's arguments at sentencing. We disagree.

Because Osborn raised no argument below regarding his competence, his claim is not preserved. Accordingly, he asks for plain error review. Rule 30.20.[4] "Rule 30.20 authorizes this [c]ourt to review, in its discretion, 'plain errors affecting substantial rights . . . when the court finds that manifest injustice or miscarriage of justice has resulted therefrom.'" *State v. Flores*, 437 S.W.3d 779, 789 (Mo. App. W.D. 2014) (quoting Rule 30.20).

"It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the prosecution of a defendant who is not competent to stand trial." *State v. Anderson*, 79 S.W.3d 420, 432 (Mo. banc 2002); *see also* § 552.020.1 ("No person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures."). "A defendant is competent when he 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual

---

[4] Rule references are to the Missouri Supreme Court Rules (2016).

5

understanding of the proceedings against him.'" *Anderson*, 79 S.W.3d at 432 (quoting *State v. Johns*, 34 S.W.3d 93, 104 (Mo. banc 2000)). "In Missouri a defendant is presumed competent, and has the burden of proving incompetence by a preponderance of the evidence." *Id.* at 432-33 (citing § 552.020.8).

"Whenever any judge has reasonable cause to believe that the accused lacks mental fitness to proceed, he shall . . . appoint one or more private psychiatrists or psychologists . . . to examine the accused . . . ." § 552.020.2. But, "[a]bsent some suggestion of mental instability, [there is] no duty to initiate an investigation of the accused's mental condition." *State v. Richardson*, 923 S.W.2d 301, 328 (Mo. banc 1996). "The need for an investigation is not indicated where the accused has the present ability to consult rationally with counsel and to understand the proceedings." *Id.* "An appellate court should determine 'whether a reasonable judge, in the same situation as the trial court, should have experienced doubt about the accused's competency to stand trial.'" *State v. Tokar*, 918 S.W.2d 753, 762-63 (Mo. banc 1996) (quoting *Branscomb v. Norris*, 47 F.3d 258, 261 (8th Cir. 1995)). But "one cannot fault a trial court judge for failing to determine a question that he/she has no reason to believe is in issue." *Id.* at 763 (quoting *Davis v. Alabama*, 545 F.2d 460, 464 (5th Cir. 1977)).

Here, in support of his claim that the court had reasonable cause to believe Osborn lacked mental fitness to proceed and thus had a duty to act *sua sponte* to question Osborn's competence, Osborn relies on a psychological examination and arguments of trial counsel at sentencing, made in pursuit of lenience.

Before sentencing, Osborn filed a "Motion for Admission of Psychological Examination Documentation," to which he attached an exhibit purporting to contain "documents relating to a psychological examination conducted by Dr. William Breckenridge, Psy.D. on June 23, 2014." Osborn's motion, however, was never ruled upon, and he made no effort at the sentencing hearing

to offer the exhibit for admission. Thus, it is unclear whether the trial court ever viewed this document. In any event, the documentation appears to relate to Osborn's application for disability income. Though it suggests the presence of some mental illness, "[t]he suspicion or actual presence of some degree of mental illness or need for psychiatric treatment does not equate with incompetency to stand trial." *Baird v. State*, 906 S.W.2d 746, 749 (Mo. App. W.D. 1995). Osborn directs us to nothing within the document itself that would cause a court to reasonably question Osborn's competence to stand trial.

Osborn further relies on arguments made by counsel in support of lenience at sentencing. "[U]nsworn remarks of counsel in opening statements, during the course of trials[,] or in arguments are not evidence of the facts asserted." *State v. Forrest*, 183 S.W.3d 218, 226 (Mo. banc 2006) (quoting *State ex rel. Horn v. Randall*, 275 S.W.2d 758, 763 (Mo. App. 1955)). Accordingly, the trial court was not required to believe the assertions made in counsel's argument. This is especially true in light of the fact that the concerns counsel expressed during arguments were apparently insufficient to cause even counsel, himself, to question Osborn's competence to proceed with sentencing in light of the fact that counsel never requested a mental evaluation.

In short, we see nothing in the record indicating that the trial court had reason to question Osborn's competence.

Point VI is denied.

## B. The trial court did not plainly err in refusing to accept Osborn's guilty plea.

In his first point on appeal, Osborn argues that the court plainly erred in refusing to accept his guilty plea to failure to appear based on his representation to the court that he did not appear because he overslept.

Osborn acknowledges that he raised no challenge to the court's refusal at any time below and, thus, requests plain error review. When engaging in plain error review, "we [first] decide

7

whether plain error has, in fact, occurred." *Flores*, 437 S.W.3d at 789. Not all prejudicial error is plain error; instead, "plain errors are those which are evident, obvious and clear." *Id*. (quoting *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009)). "In the absence of evident, obvious, and clear error, we should not proceed further with our plain error review." *Id*. "If, however, we find plain error, we must continue to the second step to consider whether or not a miscarriage of justice or manifest injustice will occur if the error is left uncorrected." *Id*.

Osborn argues that the trial court plainly erred in rejecting his guilty plea because Osborn's assertion of a defense did not preclude the court's acceptance of the plea. He further argues that he was prejudiced insofar as he lost the benefit of his plea agreement (*i.e.*, dismissal of the unlawful use of a weapon charge) and was subject to a longer aggregate sentence. The crux of Osborn's claim is that the trial court erroneously believed it was required to reject the plea in light of Osborn's indication that he merely overslept and, therefore, did not possess the requisite mental state to be guilty of failure to appear. We disagree.

"A criminal defendant does not have an absolute right under the Constitution to have his guilty plea accepted by the court . . . ." *North Carolina v. Alford*, 400 U.S. 25, 38 n.11 (1970); *see also State v. Creamer*, 161 S.W.3d 420, 424 (Mo. App. W.D. 2005); *State v. Banks*, 135 S.W.3d 497, 500 (Mo. App. W.D. 2004); *State v. Cotton*, 621 S.W.2d 296, 301 (Mo. App. E.D. 1981). "[T]he trial court has virtually unlimited discretion prior to acceptance of the plea to refuse any plea of guilty outright or to reject any plea bargain between the State and the defendant." *Creamer*, 161 S.W.3d at 425. "For this reason, it is well settled that a trial court may exercise its sound discretion to reject a guilty plea." *Id*. at 424.

It has frequently been held that "the court at a guilty plea proceeding *should* reject the plea if the record facts do not establish the commission of a crime." *Hoskin v. State*, 863 S.W.2d 637, 639 (Mo. App. E.D. 1993) (emphasis added). And Rule 24.02(e) provides that "[t]he court *shall*

8

*not* enter a judgment upon a plea of guilty unless it determines that there is a factual basis for the plea."

Here, the State charged that, "on or about February 21, 2014," Osborn, "having been charged with the felony of unlawful possession of a weapon, and having been released by order of the Honorable Louis Angles . . . pending further proceedings, and knowing that he was required to appear, . . . purposely failed to appear . . . as directed by the Court." At the hearing, Osborn denied purposely failing to appear, claiming instead that he inadvertently overslept. Thus, it appeared that a factual basis was lacking for the charged crime.[5] Under those circumstances, a court may (and, according to several cases, should) reject the plea. *Banks*, 135 S.W.3d at 500. Osborn's arguments to the contrary are not supported by any law and, therefore, are rejected.

Point I is denied.

## C. The evidence was sufficient to support Osborn's conviction for unlawful possession of an explosive weapon.

In his second through fourth points on appeal, Osborn challenges the sufficiency of the evidence to support the various elements of his unlawful possession of an explosive weapon conviction. For ease of discussion, we address the three points together.

"[W]e review a challenge to the sufficiency of the evidence by considering whether the evidence was sufficient for a rational factfinder to find each of the essential elements of the crime beyond a reasonable doubt." *State v. Patterson*, 489 S.W.3d 907, 912 (Mo. App. W.D. 2016). "'[A]ll evidence favorable to the State is accepted as true, including all favorable inferences drawn

---

[5] As discussed more fully in subsection D, § 544.665 no longer requires the failure to appear to be purposeful. But because Osborn has not raised any challenge, either below or on appeal, to the trial court's reliance on "purposeful" as the required mental state when refusing to accept Osborn's guilty plea (in fact, Osborn argues that the required mental state has remained unchanged), we need not decide whether the court's reliance at the plea hearing on the improper *mens rea* would constitute plain error.

from the evidence,' and '[a]ll evidence and inferences to the contrary are disregarded.'" *Id*. (quoting *State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011)).

"A person commits a crime if such person knowingly possesses . . . [a]n explosive . . . substance . . . with the purpose to . . . manufacture . . . an explosive weapon." § 571.020.1(2). Osborn challenges the sufficiency of the evidence to support the court's determinations that he: (1) possessed the substance (Point II); (2) did so knowing the substance was explosive (Point III); and (3) had the purpose to manufacture a weapon (Point IV).

### 1. *The evidence supported the court's finding that Osborn possessed the substance.*

In his second point, Osborn argues that he did not have actual possession of the substance when it was found and, therefore, the State was required to demonstrate constructive possession. Furthermore, he argues, because other people lived or stayed in the home, this is a joint possession case, requiring the State to introduce additional incriminating circumstances to support Osborn's knowledge and control over the substance.

Section 556.061(22) defines possession as "having actual or constructive possession of an object with knowledge of its presence."[6] Actual possession means having "the object on his or her person *or* within easy reach and convenient control." *Id*. (emphasis added). Constructive

---

[6] Section 556.061 is titled, "Code Definitions," and lists a series of definitions to be applied "[i]n this code." The "Criminal Code" to which the statute refers was passed as Senate Bill No. 60 in 1977 and became effective in 1979. Code offenses include only those offenses identified in Senate Bill No. 60; all other offenses pre- and post-dating the bill are considered offenses outside the code, even if they are numbered in such a manner as to place them among code offenses. Section 571.0[20] was first adopted in 1981 and, therefore, is an offense outside the code. Thus, it is not clear that the definition of "possess" found in section 556.061(22) applies to section 571.0[20]. Nevertheless, other courts have used this definition when analyzing a challenge to the sufficiency of the evidence supporting possession under sections 571.070 (unlawful possession of a weapon) and 573.037 (possession of child pornography), both of which are offenses outside the code. Furthermore, MAI-CR 3d 331.[32]—the verdict director for unlawful possession of a [weapon]— uses the definition of "possessed" found in § 556.061(22). Thus, we will use this definition as well.

*State v. Evans*, 410 S.W.3d 258, 262 n.3 (Mo. App. W.D. 2013) (internal citations omitted).

possession occurs when a person "has the power and the intention at a given time to exercise dominion or control over the object either directly or through another person or persons." *Id*. "Possession may also be sole or joint." *Id*. "Possession is a voluntary act if the possessor knowingly . . . receives the thing possessed, or having acquired control of it was aware of his control for a sufficient time to have enabled him to dispose of it or terminate his control." § 562.011.3.

Here, Osborn plainly did not have the substance on his person, and because none of the State's witnesses saw Osborn in the house, it is unknown if he had the substance within easy reach or convenient control while inside.[7] Thus, we will analyze Osborn's proposition that this is a constructive possession case. "To prove constructive possession, the [S]tate had to show, at a minimum, that [the defendant] had access to and control over the area where the [contraband] was found." *State v. Evans*, 410 S.W.3d 258, 262 (Mo. App. W.D. 2013) (quoting *State v. Roggenbuck*, 387 S.W.3d 376, 382 (Mo. banc 2012)).

The substance was located in the garage of Osborn's home. As the homeowner, he obviously had both access to and control over the garage. But, as Osborn notes, Guterri was Osborn's live-in girlfriend and presumably shared access to and control over the garage;[8] thus, we will treat this as a joint possession case. "In possession cases, when there is joint control over premises, 'evidence of additional incriminating circumstances' that imply knowledge may be required." *Id*. (quoting *Roggenbuck*, 387 S.W.3d at 382).

___

[7] In making this observation, we do not mean to imply that the evidence here would not support a reasonable inference of actual possession, given the testimony that officers heard someone in the garage and Osborn expressly disavowed any knowledge of the substance by the only other person present in the house. We simply do not reach the question of whether actual possession was proven in light of the fact that the evidence was sufficient to support constructive possession.

[8] It is not clear that Guterri was living at the home when the substance was discovered. Additionally, only one other person had been present in the home the day the substance was found, and Osborn expressly stated that she had no knowledge of the substance.

Additional incriminating circumstances that will support an inference of knowledge and control in a joint-control case include: the defendant's easy accessibility or routine access to the items; the defendant's close proximity to the items; finding defendant's personal belongings with the items; defendant's close proximity to the items in plain view of the police; . . . admissions by the defendant; and conduct by defendant indicating a consciousness of guilt such as making false statements in an attempt to deceive the police, nervousness during the search, and flight from law enforcement.

*Id*. at 263 (quoting *State v. Morgan*, 366 S.W.3d 565, 576-77 (Mo. App. E.D. 2012)). "In evaluating 'whether the evidence of additional incriminating circumstances sufficiently supports an inference of knowledge and control,' we look to the totality of the circumstances." *Id*. (quoting *Morgan*, 366 S.W.3d at 577).

Here, Osborn knew that the substance was in the house, as evidenced by his various statements to law enforcement indicating that he had handled the substance on multiple occasions, that he knew where in the house it was located, and that he knew it was in the house to begin with. Additionally, even accepting Osborn's claim that Guterri brought the substance into the home, he still "acquired control of it [and] was aware of his control for a sufficient time to have enabled him to dispose of it or terminate his control," § 562.011, yet he did not do so. Accordingly, the evidence was sufficient to support the court's determination that Osborn possessed the substance. Point II is denied.

### 2. The evidence supported the court's finding that he knew the substance was explosive.

In his third point on appeal, Osborn argues that the evidence was insufficient to prove that he knew the substance was explosive. We disagree.

MAI-CR 3d 331.32, the verdict-director for § 571.020.1, requires a finding that the "defendant (knew) (or) (was aware) that the item (possessed ) . . . was . . . (an) ((explosive) . . . ) ((substance) . . . )." Here, the evidence firmly established that Osborn knew the substance was explosive. First, when Guterri first brought the substance into the house, Osborn believed it to be

"C-4," a commonly known explosive material. Second, when he and Guterri got into a dispute, he threatened to turn the substance over to the police; Osborn admitted that Guterri's response to this threat caused him to believe the substance was explosive. Third, during his interview, Osborn told the detective that Guterri told him it was explosive when she first brought it home and even indicated that it could be remotely detonated by a cell phone. Fourth, Osborn told the Operation 100 negotiator that there was an explosive in the house. And finally, Osborn told the investigating detective that he did not want anyone to get hurt and there were explosives in a teddy bear in the house. All of this evidence supports the court's determination that Osborn knew the substance was explosive. Point III is denied.

### 3. The evidence supported the court's finding that Osborn had the purpose of manufacturing an explosive weapon.

In his fourth point on appeal, Osborn argues that the evidence was insufficient to support a determination that he had the purpose of manufacturing an explosive weapon with the substance. Again, we disagree.

"[T]here is no set formula as to what evidence is required to properly infer an intent to manufacture . . . ." *State v. Mickle*, 164 S.W.3d 33, 53 (Mo. App. W.D. 2005). "The requisite showing of intent, however, is 'generally not susceptible to proof by direct evidence.'" *State v. Reed*, 402 S.W.3d 146, 151 (Mo. App. W.D. 2013) (quoting *State v. Chambers*, 998 S.W.2d 85, 90 (Mo. App. W.D. 1999)). "'Instead, the necessary intent may be based upon circumstantial evidence or inferred from surrounding facts' such as the 'defendant's conduct before the act, from the act itself, and from the defendant's subsequent conduct.'" *Id*. (quoting *Chambers*, 998 S.W.2d at 90).

Here, the evidence showed that Guterri brought the explosive substance into Osborn's home in response to Osborn's extreme anxiety and fear after his alleged victimization in a recent

shooting attempt.  Osborn admitted that he was looking for some form of protection but ruled out obtaining a firearm due to having prior convictions.  When Guterri brought the substance into Osborn's home, she advised Osborn that it was something he could use "to kill these guys."  The only manner in which the substance could serve the intended purpose of protection is if it were somehow turned into a weapon.  Guterri advised Osborn that it needed to be detonated and could be done so remotely using a cell phone.  This evidence provided a reasonable inference that Osborn kept the substance with the purpose of turning it into a weapon so that he could use it to protect himself.

Relying primarily upon *State v. Lubbers*, 81 S.W.3d 156 (Mo. App. E.D. 2002), Osborn argues that the evidence was insufficient insofar as there was no evidence that he knew *how* to manufacture a weapon or was seeking to acquire such knowledge.  This court has, however, questioned the implication in *Lubbers* that the State needed to demonstrate that the defendant knew *how* to manufacture methamphetamine in order to prove that the defendant *intended* to manufacture methamphetamine:  "knowledge of how to manufacture methamphetamine is not a proof element of [the] drug offense."  *Mickle*, 164 S.W.3d at 49.

The same is true under § 571.020.1(2); nothing in the statutory language suggests that the State was required to prove that Osborn knew *how* to manufacture an explosive weapon.  The State must show only that the defendant had the purpose to do so.  Though "evidence of a defendant's knowledge of how to manufacture . . . would be relevant in determining whether he actually intended to act, common sense and logic would also dictate that such evidence alone would not be enough to infer such intention."  *Mickle*, 164 S.W.3d at 50.  In other words, "one's knowledge of how to manufacture . . . and one's intent to do so are not functional equivalents"; thus, the element requiring a purpose to manufacture does "not requir[e] a showing that [the defendant] had the knowledge of how to manufacture."  *Id*.

14

Osborn further argues that the evidence was insufficient insofar as there was no evidence of any other materials necessary to transform the substance into a weapon. Relying on numerous methamphetamine cases, he concludes that possession of an explosive material, alone, is insufficient to prove a purpose to manufacture an explosive weapon. We disagree.

To begin, many of the ingredients required for the manufacture of methamphetamine have legal, legitimate purposes apart from being used to make an illegal drug. Thus, the mere possession of a single, legal ingredient is insufficient to establish an intent to manufacture methamphetamine. But in *State v. Hawthorne*, 74 S.W.3d 821, 823 (Mo. App. S.D. 2002), the Southern District found the evidence sufficient to support the defendant's intent to manufacture methamphetamine where "[t]here [wa]s no legitimate purpose" justifying the defendant's actions of "mixing ammonia and cold or allergy pills." Here, the evidence showed that the only lawful and legitimate purpose for possessing the explosive substance was for bore blasting in a construction project. But Osborn was obviously not involved in that lawful pursuit, and therefore there was no legitimate, lawful reason for him to possess the explosive substance.

Furthermore, based upon Osborn's statements during his interview, he apparently believed that the only thing required to detonate the substance was a cell phone. Though the evidence indicated that an "initiator" of some kind is actually required to detonate the substance, as far as Osborn knew, he already had all of the necessary materials (the substance and a cell phone). That fact, coupled with the fact that the sole purpose for the substance being in his home in the first place was to protect him from the alleged shooters, constitutes sufficient evidence to support the court's determination that Osborn possessed the substance for the purpose of manufacturing an explosive weapon. Point IV is denied.

15

**D. The evidence was sufficient to support Osborn's conviction of failure to appear.**

In his fifth point on appeal, Osborn argues that the evidence was insufficient to support his conviction of failure to appear insofar as the evidence did not show that his nonappearance was purposeful. In making this argument, Osborn misconstrues the elements of the crime of failure to appear.

"[A]ny person who, having been released upon a recognizance or bond . . . while pending preliminary hearing, . . . knowingly fails to appear before any court . . . as required shall be guilty of the crime of failure to appear." § 544.665.1.

Section 544.665 was amended in 2009, with an effective date of August 28, 2009.

*Before* this amendment, the statute provided that

> any person who, having been released pursuant to sections 544.040 to 544.665, or upon a recognizance or bond pursuant to any other provisions of law *willfully* fails to appear before any court or judicial officer as required shall be guilty of an offense[.]

*State v. Seay*, 395 S.W.3d 64, 66 (Mo. App. W.D. 2013) (quoting § 544.665, RSMo Cum. Supp. 2008) (emphasis added).

Before the 2009 amendment to § 544.665, courts interpreted "willfully," in the context of failure to appear, to mean "purposely" or "intentionally." *See, e.g., State v. McCoy*, 90 S.W.3d 503, 505 (Mo. App. E.D. 2002) ("[T]he State must show, by either direct or circumstantial evidence, that he purposely failed to appear."); *State v. Charles*, 538 S.W.2d 944, 946 (Mo. App. 1976) ("As to the state's showing that appellant 'willfully' failed to appear for trial, that quoted term was defined . . . as simply meaning intentional."). And based upon these interpretations, courts naturally held that a mere "showing that the defendant was not present in court when required to appear is not adequate." *State v. Lasley*, 130 S.W.3d 15, 18 (Mo. App. E.D. 2004).

16

But, in 2009, the legislature changed "willfully" (i.e., purposely or intentionally) to "knowingly." "Purposeful conduct means more than actual knowledge." *Laut v. City of Arnold*, 491 S.W.3d 191, 199 (Mo. banc 2016). "Every purposeful violation also is a knowing violation, but the opposite is not true." *Id*. at 203 (Fischer, J., dissenting); *see* § 562.021.4 ("When acting knowingly suffices to establish a culpable mental state, it is also established if a person acts purposely."). "The two terms are not synonymous." *Laut*, 491 S.W.3d at 203 (Fischer, J., dissenting).

Though no Missouri case has yet addressed the effect of this portion of the 2009 amendment,[9] Osborn relies on *State v. Lee Mechanical Contractors, Inc.*, 938 S.W.2d 269 (Mo. banc 1997), a Missouri Supreme Court case decided twelve years before the amendment at issue, to argue that this particular amendment effected no change in the *mens rea* part of the statute. We disagree.

"When the legislature amends a statute, it is presumed that its intent was to bring about some change in the existing law." *Kolar v. First Student, Inc.*, 470 S.W.3d 770, 777 (Mo. App. E.D. 2015). "The legislature is presumed to have acted with a full awareness and complete knowledge of the present state of the law, including judicial and legislative precedent." *Id*. "This Court should never construe a statute in a manner that would moot the legislative changes, because the legislature is never presumed to have committed a useless act." *Id*. "To amend a statute and accomplish nothing from the amendment would be a meaningless act." *Id*.

_____

[9] *State v. Seay*, 395 S.W.3d 64 (Mo. App. W.D. 2013), and a few other cases have addressed a different portion of the amendment, related to punishment and the nature of the underlying offense for which the person failed to appear.

In *Lee*, the Court was called upon to determine the constitutionality of a statute imposing a penal sanction for the "willful violation of the prevailing wages on public works." *Lee*, 938 S.W.2d at 270. As part of its analysis, the Court discussed the meaning of the term, "willfully":

> The term "willfully" predates statehood and is still used despite its omission from the levels of scienter in the Criminal Code. Appellate courts in Missouri have generally held that in criminal offenses, "willfully" means "knowingly." The General Assembly, in updating a pre-Code offense, has substituted "knowingly" for "willfully," implying that the terms are synonymous. Under the Criminal Code's scheme of culpable mental states, "willfully" as used in section 290.340 means "knowingly."

*Id*. at 272 (internal citations omitted). Relying on this language, Osborn argues that the 2009 amendment to § 544.665 did nothing more than "clean up" the language regarding intent.

Osborn's argument that purposeful remains the required mental state, however, ignores the fact that the term "willful" has been subject to numerous interpretations. The Comment to 1973 Proposed Code following § 562.016 notes that the purpose of enacting § 562.016 was to create uniformity and rectify existing inconsistencies:

> Section 562.016 simplifies the number of terms used to describe the culpable mental states and provides definitions of them. Present Missouri statutes use a variety of terms to describe the necessary mental state. For example: wilfully; willfully and corruptly; knowingly and willfully; willful and malicious; voluntarily; deliberately; on purpose and of malice aforethought; unlawfully and purposely; intentionally; willfully and maliciously or cruelly; willfully, maliciously or contemptuously; wrongfully and willfully; willfully or negligently; willfully or recklessly; knowingly and negligently; and there are many others.

The Comment specifically noted that, "[w]hile some of these terms have been defined by judicial decisions with regard to specific crimes, others are vague at best and ***the meaning of a given term, such as 'willful', may vary from crime to crime***." *Id*. (emphasis added). In the context of failure to appear, our courts interpreted "willfully" to mean purposely or intentionally. Thus, the 2009 amendment, altering the *mens rea* from "willfully" to "knowingly," effectively lowered the State's burden of proof under § 544.665. In order to give effect to the 2009 amendment, we hold that,

under § 544.665, to meet its burden of proof, the State need only establish that the defendant was aware that he was required to appear in court on a certain date and at a certain time and that he failed to do so.

This is not to say that a defendant, once knowing of a court date, is thereafter without defense to a charge of failure to appear. Our criminal statutes require proof of both a voluntary act or omission and a culpable mental state. *See* §§ 562.011.1, 562.016.1. "A 'voluntary act' is [either] . . . [a] bodily movement performed while conscious as a result of effort or determination; or . . . [a]n omission to perform an act of which the actor is physically capable." § 562.011.2 (1-2). "A person is not guilty of an offense based solely upon an omission to perform an act unless the law defining the offense expressly so provides, or a duty to perform the omitted act is otherwise imposed by law." § 562.011.4.

In the context of failure to appear, the voluntary act is an act of omission (*i.e.*, failing to do something one is required to do), premised upon a court order to appear. Accordingly, if a defendant's failure is involuntary in the sense that he is physically incapable of appearing through unforeseen circumstances (*e.g.*, traumatic injury or disease requiring hospitalization, unexpected interference with travel, etc.), he could certainly put forth a defense that the State could not prove a voluntary act beyond a reasonable doubt.

Regarding the culpable mental state, a defendant could put forth a defense if he was somehow unaware of the scheduled date and time of his required appearance (*e.g.*, through insufficient or inaccurate notice). But, under the 2009 amendment, if a defendant was physically capable of appearing, a claim that the failure to appear was unintentional or inadvertent is no longer a defense.

Because the State presented evidence demonstrating that Osborn knew of the time and date of his required court appearance and that he did not appear, the evidence was sufficient to support

19

his conviction. The trial court was free to reject the evidence Osborn presented in his defense. *See State v. Crawford*, 68 S.W.3d 406, 408 (Mo. banc 2002) ("The fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case.").

Point V is denied.

**Conclusion**

There is nothing in the record that required the trial court to question Osborn's competence to proceed. Osborn has not articulated a basis for finding that the trial court plainly erred in exercising its broad discretion to reject his plea of guilt. Finally, there was sufficient evidence from which the trial court could find Osborn guilty of the possession of an explosive weapon and the knowing failure to appear. Accordingly, the trial court's judgment is affirmed.

_____
Karen King Mitchell, Presiding Judge

Cynthia L. Martin and Gary D. Witt, Judges, concur.