**STATE of Missouri, Respondent,**

v.

**Krystal TRESLER, Appellant.**

**No. ED 104415**

Missouri Court of Appeals,
Eastern District,
NORTHERN DIVISION.

Filed: September 12, 2017

Motion for Rehearing and/or Transfer
to Supreme Court Denied
October 23, 2017

Application for Transfer Denied
December 19, 2017

Samuel Buffaloe, 1000 West Nifong, Bldg. 7, Ste. 100, Columbia, MO 65203, for appellant.

Joshua D. Hawley, Atty. Gen., Daniel N. McPherson, Asst. Atty. Gen., P.O. Box 899, Jefferson City, MO 65102, for respondent.

LAWRENCE E. MOONEY, JUDGE

The defendant, Krystal Tresler, appeals the judgment of the Circuit Court of Ralls County following her conviction by a jury of one count of first-degree robbery in violation of section 569.020 RSMo. (Supp. 2014), and one count of second-degree felony-murder, in violation of section 565.021 RSMo. (Supp. 2014). The trial court imposed consecutive sentences of ten years of imprisonment on each count.

First, although the initial prosecutor had indicated that in his opinion the defendant, Tresler, was a witness and nothing more, we find that the State made no promise that it would not prosecute her if she testified at a co-defendant's preliminary hearing. Thus, we do not apply the equitable-immunity doctrine. Second, we hold that the trial court did not abuse its discretion in refusing to admit a letter from the initial prosecutor about the defendant's cooperation. Third, we hold that the trial court did not commit prejudicial error when it gave the jury the verdict director for first-degree robbery. Finally, we hold that the trial court did not abuse its discretion when it denied the defendant's request for a mistrial. Therefore, we affirm the trial court's judgment.

## Factual and Procedural Background

The defendant does not contest the sufficiency of the evidence to support her convictions. Viewed in the light most favorable to the verdict, the evidence at trial revealed the following. The defendant, her boyfriend Gary Wiltermood, and three other persons whom the defendant met through Wiltermood—Amanda Lehenbauer, Michael Studer, and Cuda Dodd—spent the night of October 7, 2013 and the early morning of October 8, 2013 driving around the Hannibal area in the defendant's minivan. Wiltermood drove, the defendant sat in the front passenger seat, and Studer, Lehenbauer, and Dodd sat in the second row of seats. While the group rode around Hannibal, Lehenbauer heard Wiltermood and Studer discuss committing a robbery. Lehenbauer did not think much about it at the time because, she explained, Studer "comes up with everything and never follows through," In his statement to police, Wiltermood told police that "[e]verybody in the vehicle knew what was going on because Mikey [Studer] was talking to all of us."

In the early morning of October 8th, three members of the group wanted to use the restroom, so they stopped at Walmart. The defendant, Studer, and Dodd went into Walmart while Lehenbauer and Wiltermood waited in the van. The defendant used the restroom and immediately returned to the van where she sat in the second row of seats. Dodd and Studer came out of Walmart some minutes later. Studer carried a pair of camouflage gloves and a hat, and he took the defendant's place in the front passenger seat. The group drove back to the motel where Wiltermood had a room, According to Wiltermood's statement to police, he retrieved his gun at this time for Studer to use in the robbery. After about 45 minutes at the motel, the group decided to go for a ride.

The defendant again sat in the second-row seats on the passenger side of the van. Lehenbauer sat in the middle of the second row, and Dodd sat behind the driver. Studer sat in the front passenger seat while Wiltermood drove.

Around 3:00 a.m. on October 8th, the group decided to go to Abel's Quick Shop on Shinn Lane in Hannibal. The defendant gave Wiltermood directions to Shinn Lane, and Hannibal police Sergeant Jennifer Grote testified that the group would have passed several other gas stations between the motel and the Abel's on Shinn Lane. Wiltermood dropped Studer in the parking lot of a bank next door to Abel's. Wiltermood then drove to Abel's, parked at a gas pump with the van directly facing the front of the store, and put $10 of gas in the van as Studer had instructed. In the meantime, Dodd went into Abel's ostensibly to use the restroom. Lehenbauer and the defendant remained seated in the second-row seats in the van with a clear view into the Abel's store.

Wiltermood finished pumping the gas, and went inside to the cash register just as Dodd came out of the store. At that point, Studer came around the side of the store wearing the camouflage gloves and ski hat. Studer carried the gun provided by Wiltermood. Studer entered the store and confronted the clerk, Adrienne Arnett. Lehenbauer testified that she saw Arnett wave a clipboard at Studer, Wiltermood ran out of the store as Studer fired the first shot. Lehenbauer heard Studer fire two shots, heard a third shot, and saw Arnett grab her chest and fall. Wiltermood entered the van, and began to drive away. Lehenbauer testified that she was "freaking out," but that the defendant remained calm. The defendant and Dodd told Lehenbauer to "shut up," that everything would be okay. Studer chased the van, and Wiltermood

stopped so that Studer could enter the van.

Studer instructed Wiltermood to drive to the Mississippi River, which he did. At the river, everyone except Wiltermood exited the van. Studer threw his camouflage gloves, coat, and presumably the gun into the liver. Wiltermood left in the van. The defendant, Studer, Lehenbauer, and Dodd walked back to the motel where Wiltermood was staying. They then met up with Wiltermood at an apartment in Hannibal. At some point, the defendant retrieved her van and left the others.

Police interviewed the defendant at about 7:30 a.m. on October 8, 2013, and she told them she was at home at the time of the robbery. Eventually, the defendant admitted her presence at the crime, and told Sergeant Grote that "I didn't know if it [the robbery] was going to be a success. I didn't know if it was going to be a fucking failure." The defendant gave a signed statement to police later that day. She stated that the van belonged to her; that she gave Wiltermood directions to the Abel's store; that they dropped Studer off at the bank before proceeding to Abel's; that she saw Studer enter the store and heard three shots fired; that she heard Studer admit shooting the clerk; that she accompanied the group to the river where Studer disposed of the gun, hat, gloves, and his jacket; and that she remained with other members of the group until Wiltermood called her and told her to pick up her van.

The Marion County Prosecuting Attorney, the initial prosecutor, immediately filed complaints against Studer and Wiltermood. The State subpoenaed the defendant to testify at Studer's preliminary hearing, and the defendant consulted an attorney ("preliminary-hearing counsel")

about whether she should do so.[1] According to his hearing testimony on the defendant's motion to dismiss the charges, preliminary-hearing counsel stated that he spoke via telephone with the prosecuting attorney because he was concerned that his client might be the focus of an investigation or a suspect. Preliminary-hearing counsel understood from his discussion with the prosecuting attorney "that, in [the prosecutor's] opinion and his review of the case, that [Tresler] was a witness and nothing more and he had no intention of charging her with any offense regarding the incident." On cross-examination, preliminary-hearing counsel testified that he did not negotiate an agreement that the State would not charge his client.

> Q. Okay. And at that time did you all negotiate any sort of plea (sic) agreement—
>
> A. No.
>
> Q. —that if she were to testify, she would not be charged?
>
> A. *No.* I mean, I—at that point, based on what [the prosecutor] told me, he said she was not going to be charged.
>
> Q. Okay. She was not the focus and that he did not have intent to charge her at that time?
>
> A. That he had—yeah, That he, as far—I think his words to me were, "*I consider her to be a witness and nothing more.*"

Furthermore, preliminary-hearing counsel did not state that the initial prosecutor told him if Tresler testified against Studer and/or Wiltermood, she would not be charged. No other witnesses testified at the hearing on the defendant's motion to dismiss.

The defendant testified at Studer's preliminary hearing. She acknowledged that she owned the van the group used the day of the robbery and murder, and she described the group's Walmart stop, Studer's exit from Walmart with a camouflage hat and gloves, the seating arrangements in the van, Studer's exit from the van in the bank parking lot, his walk from the bank around the back of the Abel's and into the store, the confrontation in the store, Studer's shooting of Arnett, and the group's travel to the river where Studer disposed of clothing and presumably the gun. On cross-examination, the defendant denied knowing that anyone in the group was drinking alcohol or using drugs, and she denied hearing anyone talk about robbing a gas station. She also denied that she made any deals with the State in connection with the case or in exchange for her testimony.

> Q. Have you made any deals with the State of Missouri to testify here today?
>
> A. No, ma'am.
>
> Q. Or in this case at all?
>
> A. No, ma'am.

Studer and Wiltermood each pled guilty to murder. Several weeks after the defendant testified at Studer's preliminary healing, the initial prosecutor wrote a letter for the defendant to her legal counsel in an Arkansas child-custody matter. The letter stated:

> Krystal Treasler (sic) is a witness for the Prosecution in a robbery/murder case which I filed. She is not a suspect or co-conspirator and will not be charged with any crime. Her unfortunate presence at the scene of this crime should not be used against her in any

---

1. This attorney, the defendant's counsel at the time of Studer's preliminary hearing, did not represent the defendant in connection with

the criminal charges that the State ultimately filed against her.

custody dispute. She has been cooperative with my office and with the police.

Shortly thereafter, the elected Marion County Prosecuting Attorney became a judge, and the new Marion County Prosecuting Attorney sent the cases against Studer and Wiltermood to the Attorney General's Office for prosecution because of a conflict of interest. The Attorney General eventually charged the defendant with first-degree robbery and second-degree felony murder in connection with the death of Arnett. The record gives no indication about what prompted the filing of charges against the defendant. Lehenbauer, Wiltermood, and Studer testified for the State in the defendant's four-day trial. The defendant did not testify. After deliberating for less than three hours, the jury found the defendant guilty of first-degree robbery and second-degree felony murder. Following the jury's recommendation, the trial court imposed consecutive sentences of ten years of imprisonment on each count. The defendant appeals.

### Discussion

In four points on appeal, the defendant challenges the trial court's denial of her motion to dismiss the charges, the court's refusal to admit into evidence the letter from the initial prosecutor about the defendant's cooperation, the verdict director for first-degree robbery, and the court's

denial of the defendant's request for a mistrial.

### Point I

In her first point on appeal, the defendant claims the trial court abused its discretion when it denied her motion to dismiss. She argues that she had an implicit agreement with the Marion County Prosecuting Attorney that she would not be prosecuted if she testified at Studer's preliminary hearing, that she fulfilled her duty by testifying at the hearing, and that this prosecution is directly related to the matters about which she testified.

We review the trial court's denial of a motion to dismiss a criminal charge for an abuse of discretion. *State v. Williams*, 411 S.W.3d 315, 319 (Mo. App. E.D. 2013). A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances and is so unreasonable that it indicates a lack of careful consideration. *State v. Sanders*, 481 S.W.3d 907, 913 (Mo. App. E.D. 2016).

In Missouri, prosecutors lack the inherent authority to grant immunity. *State ex rel. Munn v. McKelvey*, 733 S.W.2d 765, 770 (Mo. banc 1987). Section 491.205 RSMo. (2016), however, provides that a prosecutor can obtain a court order to compel a person's testimony in exchange for full transactional immunity under certain circumstances.[2] The procedures

2. Our Supreme Court's *Munn* decision "made clear that *prosecutors* do not have the inherent authority to grant defendants immunity from prosecution but could only do so pursuant to legislative direction." *Gerlt v. State*, 339 S.W.3d 578, 583 (Mo. App. W.D. 2011)(emphasis in original). The Missouri legislature enacted section 491.205 after the *Munn* decision. *Id.* at 583 n.5. Section 491.205.1 provides:

In the case of any individual who has been or may be called to testify or provide other information at any proceeding ancillary to

or before a circuit or associate circuit court or grand jury of the state of Missouri, the judge of the circuit in which the proceeding is or may be held may issue, in accordance with subsection 2 of this section, upon the written request of the prosecuting attorney an order requiring such individual to give testimony or provide other information which the individual refuses to give or provide on the basis of the individual's privilege against self-incrimination. When such an order is issued, the witness may not refuse to comply with the order on the basis

of section 491.205 were not followed here. Instead, the defendant contends that she had an implicit agreement with the prosecutor that she would not be charged in connection with the events surrounding Arnett's death. The defendant argues that, as a result of this implicit agreement, she is entitled to equitable immunity.

Citing *Munn*, the State counters that "[p]rosecutorial promises of immunity that are not authorized by statute are not binding and constitute no bar to a subsequent prosecution of the immunized witness[,]" and that "the only avenue for immunity to be granted is an agreement approved by a judge under the provisions of section 491.205[.]" We expressly reject this argument for two reasons. First, the question presented in *Munn* was not about the doctrine of equitable immunity, but the authority of the prosecutor to promise immunity in the first place. *Id.* More importantly, we reject the State's argument because of the due-process rights implicated when a governmental promise of immunity, whether authorized by statute or not, induces a defendant to waive her Fifth Amendment rights by testifying or otherwise cooperating with the prosecution.

*Munn* indeed held "that this power [to grant immunity] does not inher[e] in the office of prosecutor, but rather that Missouri prosecutors may obtain the authority to grant immunity only after legislative deliberation and the approval of carefully drawn legislation." *Id.* at 769. But *Munn* then observed that this conclusion does not contravene the two United States Supreme Court cases that gave rise to the doctrine

of equitable immunity, *Shotwell Manufacturing Company v. United States*, 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963), and *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), and their progeny. *Id.* at 769-70.

In *Shotwell*, the U.S. Supreme Court held that when evidence of guilt is induced under a governmental promise of immunity, the self-incrimination clause of the Fifth Amendment requires exclusion of the evidence. 371 U.S. at 347, 83 S.Ct. 448. After plea negotiations in *Santobello*, the prosecutor agreed to allow the defendant to plead guilty to a lesser-included offense, and agreed to make no sentencing recommendation. 404 U.S. at 258, 92 S.Ct. 495. The defendant accordingly pled guilty, but after a series of delays, a different prosecutor recommended the defendant receive the maximum sentence, which the court imposed. *Id.* at 258-60, 92 S.Ct. 495. The U.S. Supreme Court vacated the judgment and remanded the case, holding that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Id.* at 262-63, 92 S.Ct. 495.

Let us consider closely the words used in *Santobello*. We observe that the *Santobello* Court used the words "promise *or* agreement of the prosecutor" (emphasis added). A "promise" means "[t]he manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in

of the witness's privilege against self-incrimination, but after complying with the order and giving the testimony or producing the evidence compelled by the order, no such person shall be criminally prosecuted or subjected to any criminal penalty for or on account of any act, transaction, matter or thing which is the subject matter of the

inquiry in which the person testifies or produces evidence, except a prosecution for perjury, giving a false or misleading statement or contempt committed in answering or failing to answer, or in producing or failing to produce evidence in accordance with the order.

understanding that a commitment has been made; a person's assurance that the person will or will not do something." *Black's Law Dictionary* 1228-29 (7th ed. 1999). A "conditional promise" is "[a] promise that is conditioned on the occurrence of an event." *Id.* at 1229. An "agreement" is "[a] mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons." *Id.* at 67. We construe *Santobello*'s language to encompass both conditional promises creating unilateral contracts and bilateral contracts, commonly understood as "agreements." [3]

■ As *Munn* explained in distinguishing its issue from the issue of equitable immunity, the doctrine of equitable immunity emerged following the U.S. Supreme Court's *Shotwell* and *Santobello* decisions. 733 S.W.2d at 770.

> Under this doctrine the government is required by due process as well as equity, to honor its agreements to grant immunity "when it appears from the record that: (1) an agreement was made; (2) the defendant has performed on his side; and (3) the subsequent prosecution is directly related to offenses in which the defendant, pursuant to the agreement, either assisted with the investigation or testified for the government."

*Id.* (quoting *Rowe v. Griffin*, 676 F.2d 524, 527-28 (11th Cir. 1982)). The purpose of the doctrine is to preserve the integrity of the government by requiring it to fulfill a promise of immunity made by its agents—the prosecutors—once a witness testifies in reliance on the promise. *Id.*

■ To protect the voluntariness of a waiver of Fifth Amendment rights, the government must keep its promise when a plea, confession, or admission is based on a promise of a plea bargain or immunity. *U.S. v. Weiss*, 599 F.2d 730, 737 (5th Cir. 1979). "A defendant who pleads guilty as a result of a plea bargaining agreement has a due process right to enforcement of the bargain." *Rowe*, 676 F.2d at 528 (citing *Santobello*, 404 U.S. at 262, 92 S.Ct. 495). Likewise, when a governmental promise of immunity induces a defendant to waive her Fifth Amendment rights by testifying against her cohorts or otherwise cooperating with the government to her detriment, due process requires that the prosecutor's promise of immunity be fulfilled. *Id.*

■ Specific performance of an agreement not to prosecute—in other words dismissal of the charges—is appropriate unless: (1) the government made no firm promise of immunity; (2) the defendant failed to fulfill her part of the bargain; (3) the government's offer of immunity or the defendant's acceptance was based on a mistake of law or fact; (4) the term for which the defendant seeks specific performance was not a term of the contract; (5) the government's decision to seek an indictment was made in good faith; (6) the government's breach resulted in no prejudice to the defendant; or (7) specific enforcement would have an adverse effect on the public. *U.S. v. Johnson*, 861 F.2d 510, 512-13 (8th Cir. 1988).

■ "[A]n analysis of the binding effect of an agreement not to prosecute

---

**3.** A "unilateral contract" is "[a] contract in which only one party makes a promise or undertakes a performance." *Black's Law Dictionary* 326 (7th ed. 1999). In other words, a contract in which one party exchanges a promise for the other party's act or forbearance. A "bilateral contract," on the other hand, means a contract in which each party promises a performance, a promise exchanged for a promise on the other side. *Id.* at 319.

should consider 'whether there was a promise held out to which the government, as a matter of fair conduct, might be bound.'" *Rowe*, 676 F.2d at 527 (quoting *Weiss*, 599 F.2d at 738). Thus, the threshold requirement for application of the doctrine of equitable immunity is that the government must have made a firm promise—a commitment or assurance—not to prosecute. The question is not whether the defendant subjectively expected that the government would not prosecute her, but whether the government held out a promise by which it might be bound. *Weiss*, 599 F.2d at 738. This does not mean that the State can lure an accused into cooperation through a course of dealing calculated to foster the subjective expectation of an agreement. *Id.* at 738 n.17. Here, however, we find no evidence that the State held out a conditional promise that it would not prosecute the defendant if she testified at Studer's preliminary hearing, or that it engaged in conduct calculated to lead the defendant to expect an agreement.

Preliminary-hearing counsel represented the defendant at the time of Studer's preliminary hearing, and he testified at the hearing on the defendant's motion to dismiss the charges against her. Preliminary-hearing counsel stated that he spoke via telephone with the Marion County Prosecuting Attorney, the initial prosecutor, because he was concerned that his client might be the focus of an investigation or that she might be a suspect. Preliminary-hearing counsel testified that the prosecutor said words to the effect that "I consider her to be a witness and nothing more." Preliminary-hearing counsel did not testify that the Marion County Prosecuting Attorney promised the defendant immunity or anything else in exchange for her cooperation or testimony. On cross-examination, preliminary-hearing counsel testified that he did not negotiate an agreement that the State would not charge his client.

Q. Okay. And at that time did you all negotiate any sort of plea (sic) agreement—

A. No.

Q. —that if she were to testify, she would not be charged?

A. *No.* I mean, I—at that point, based on what [the prosecutor] told me, he said she was not going to be charged.

Q. Okay. She was not the focus and that he did not have intent to charge her at that time?

A. That he had—yeah. That he, as far—I think his words to me were, *"I consider her to be a witness and nothing more."*

The defendant herself testified at Studer's preliminary hearing that she had not made any bargain with the State in connection with the case:

Q. Have you made any deals with the State of Missouri to testify here today?

A. No, ma'am.

Q. Or in this case at all?

A. No, ma'am.

The testimony of preliminary-hearing counsel at the hearing on the defendant's motion to dismiss and the defendant's testimony at Studer's preliminary hearing undercut her claim. The defendant's testimony that she had no "deal" specifically undercuts her current argument that she and the State had reached an "implicit bargain." The record reveals neither evidence of a conditional promise of immunity nor evidence of the defendant's reliance on any promise. The defendant did not establish that she had a reasonable expectation of immunity from prosecution based on either a conditional promise of immunity from the State in exchange for her testimony, or an agreement with the State promising immunity in exchange for her promise to testify. Furthermore, only *after*

the defendant testified at Studer's preliminary hearing did the initial prosecutor write to the defendant's family-law attorney stating that he, the prosecutor, did not intend to charge the defendant with any crime. Thus, the defendant cannot argue that this letter constituted a promise that led her to testify in the belief that she had an agreement with the State. Nor can she argue that writing the letter constituted conduct calculated to lead her to believe she had an agreement with the prosecutor in order to secure her testimony.

 The defendant bore the burden of establishing her entitlement to dismissal of the criminal charges. The defendant failed to establish that the State held out a promise of immunity in exchange for her testimony at Studer's preliminary hearing. At most, the record reveals that the initial prosecutor represented that he did not intend to charge the defendant because she was merely a witness.[4] Without a governmental promise of immunity, due process does not compel application of the doctrine of equitable immunity. We deny the defendant's first point.

### Point II

 In her second point, the defendant claims the trial court abused its discretion in rejecting her proposed defense exhibit A, the letter about the defendant's cooperation from the Marion County Prosecuting Attorney, the initial prosecutor. The defendant argues that "this evidence was relevant to show the jury that although [the defendant] was not truthful with the police for a period of hours on the morning after

the robbery occurred, she was cooperative with the police and prosecutor for approximately a year before she was ever charged with a crime."

On cross-examination, defense counsel asked Sergeant Grote whether the defendant cooperated in the police investigation. Having previously testified that the defendant lied "throughout the whole interview," Sergeant Grote replied that she believed the defendant had not cooperated. The defendant later sought to introduce the initial prosecutor's letter to counter Sergeant Grote's testimony that, in her opinion, the defendant did not cooperate with police. The text of the letter stated in full:

> Krystal Treasler (sic) is a witness for the Prosecution in a robbery/murder case which I filed, She is not a suspect or co-conspirator and will not be charged with any crime. Her unfortunate presence at the scene of this crime should not be used against her in any custody dispute. She has been cooperative with my office and with the police.

Defense counsel told the court he was willing to redact the portion of the letter stating that the defendant was not a suspect or co-conspirator and would not be charged.

Defense counsel argued the letter's statement that the defendant served as a witness for the prosecution would counter the State's contention that the defendant demonstrated consciousness of guilt by lying to police the morning of the robbery. In closing, the State did argue that the defendant lied to police to hide her involve-

---

4. The record does not reveal why the State eventually charged the defendant. The trial court asked during the hearing on the motion to dismiss whether new evidence led to the charging decision, and this Court asked during oral argument what prompted the filing of charges, Neither trial counsel nor appellate counsel for either party could provide an explanation. We surmise that the change in prosecuting agency may have played a role in the assessment of the defendant's criminal liability, but this is only a conjecture given the silence of the record.

ment. The defense countered that by the end of the morning of the robbery and murder, the defendant told police the truth and later testified at Studer's preliminary hearing.

We review the trial court's decision regarding the admission or exclusion of evidence for an abuse of discretion. *Sanders*, 481 S.W.3d at 913. We will reverse only if the defendant demonstrates both error and prejudice, with prejudice meaning a reasonable probability that the error affected the trial's outcome. *Id.*

The essence of the defendant's argument is that the letter—or at least the portion of the letter stating that the defendant cooperated with the State—should have been admitted because "[i]f being uncooperative is indicative of guilt, cooperation is indicative of innocence," However, the jury had already heard evidence that the defendant had cooperated with the State. The State earlier read in full the defendant's testimony from Studer's preliminary hearing to the jury, and also proffered the defendant's extensive written statement given to police the day of the crimes. The jury could certainly infer that the defendant was cooperative when she testified for the prosecution at Studer's preliminary hearing, answering the questions without equivocation. In fact, defense counsel argued this to the jury in closing.

We find no reasonable probability that the jury would have acquitted the defendant had the trial court admitted cumulative evidence that the defendant eventually cooperated with the State. We deny the defendant's second point.

### Point III

■ In Point III, the defendant claims the trial court erred in submitting to the jury Instruction Number 7, the verdict director for first-degree robbery. The defendant contends this instruction deviated from MAI-CR 3d 304.04 and had the potential to confuse and mislead the jury, thereby prejudicing her.

■ Whenever there is an MAI-CR instruction applicable under the law, the trial court should give the MAI-CR instruction to the exclusion of any other. *State v. Drisdel*, 417 S.W.3d 773, 782 (Mo. App. E.D. 2013). If a party makes a proper timely objection, an instruction in violation of MAI-CR is presumptively prejudicial unless the contrary is clearly shown. *Id.* An erroneous instruction prejudices a defendant whenever the instruction may have adversely influenced the jury, or if the instruction has the potential to confuse or mislead the jury. *Id.* However, we will reverse only when the instructional error is so prejudicial that it deprived the defendant of a fair trial. *Id.*

■ The parties disagree whether the defendant properly preserved this claim for appeal. The State argues that the defendant's claim is not preserved for appeal because she did not object to the verdict director's deviation from MAI-CR 3d 304.04 at the instruction conference or in her motion for new trial. Failure to object to an alleged error at the earliest opportunity does not preserve the issue for appeal. *Id.* at 785. We can review an issue that was not preserved only for plain error. *Id.* To receive relief under plain-error review, the defendant must demonstrate manifest injustice, a higher bar than prejudice. *State v. Morgan*, 366 S.W.3d 565, 582 (Mo. App. E.D. 2012). However, because we conclude that the defendant's claim fails under review for either abuse of discretion or plain error, we analyze the issue as if it were preserved. *State v. Alexander*, 505 S.W.3d 384, 390 (Mo. App. E.D. 2016).

Jury instruction number 7 stated:

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about October 8, 2013 in the County of Marion, State of Missouri, Michael Studer took cigarettes and lottery tickets in the charge of Adrienne Arnett, and

Second, that Michael Studer did so for the purpose of withholding it from the owner permanently, and

Third, that Michael Studer in doing so used physical force on or against Adrienne Arnett for the purpose of preventing resistance to the taking of the property, and

Fourth, that in the course of taking the property Michael Studer caused serious physical injury to Adrienne Arnett,

then you are instructed that the offense of Robbery in the First Degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fifth, that *with the purpose of promoting or furthering the commission of that Robbery in the First Degree*, the defendant aided or encouraged Michael Studer by providing her van, providing directions to the robbery, by accompanying Michael Studer to the robbery, *and* by fleeing the robbery with Michael Studer,

then you will find the defendant guilty under Count I of Robbery in the First Degree.

However, unless you find and believe from the evidence beyond a reasonable doubt *each and all* of these propositions, you must find the defendant not guilty of Robbery in the First Degree.

As used in this instruction, the term "serious physical injury" means physical injury that creates a substantial risk of death or that causes serious disfigure-

ment or protracted loss or impairment of the function of any part of the body.

(Emphases added). The defendant claims error because of the language in paragraph Fifth that states, "by providing her van, providing directions to the robbery, by accompanying Michael Studer to the robbery, and by fleeing the robbery with Michael Studer[.]"

The relevant paragraph of MAI-CR 3d 304.04, which deals with accessorial liability, instructs the parties to include the following language in the verdict director.

(Second) (Third) ( [*next numbered paragraph*] ), that with the purpose of promoting or furthering the commission of that [*name of offense*], the defendant [*Insert basis for defendant's conduct being sufficient for being criminally responsible, using one of the following "(acted together with) (aided or encouraged) (acted together with or aided)." See Notes on Use 5 for the various options and when they should be used. After the appropriate option(s), state the name(s) of other person(s) or, if unknown, a general identification of the other(s) involved, such as "another person," "other person(s)," etc.*] in committing the offense, (and)[.]

Thus, the defendant contends that the instruction should have read as follows:

Fifth, that with the purpose of promoting or furthering the commission of that Robbery in the First Degree, the defendant aided or encouraged Michael Studer in committing the offense.

The defendant argues the instruction could have confused and misled the jury into believing that, if it found the defendant took the identified actions, then she was automatically guilty of first-degree robbery. Thus, the jury could have been misled into believing that it need not separately decide whether the defendant took

these actions with the intent to aid and encourage the robbery. We disagree.

The defendant correctly points out that the verdict director deviated from MAI-CR 3d 304.04 in its inclusion of specific actions, namely "by providing her van, providing directions to the robbery, by accompanying Michael Studer to the robbery, and by fleeing the robbery with Michael Studer[.]" MAI-CR 3d 304.04 does not call for listing specific actions but simply refers to aiding or encouraging another person "in committing the offense." However, the disputed paragraph begins by expressly instructing the jury that the defendant must have acted "with the purpose of promoting or furthering the commission of that Robbery in the First Degree." The jury would have understood that if it determined the defendant took such actions, then it also had to find that the defendant took those actions *with the purpose of promoting or furthering* commission of the robbery.

While the language of the verdict director deviates from MAI-CR 3d 304.04, the language effectively placed a higher burden on the State to establish that the defendant undertook multiple actions with the purpose of promoting or furthering commission of the robbery. Had the language not deviated from the approved instruction, the jury would have been required to find that "with the purpose of promoting or furthering the commission of that Robbery in the First Degree, the defendant aided or encouraged Michael Studer in committing the offense." Thus, the jury could have found that any one action of the defendant aided or encouraged Studer and was done with the purpose to further or promote commission of the crime. Instead, as instructed and as argued by the defense in closing, the jury had to find that the defendant took all four

such actions with the purpose of promoting or furthering commission of the robbery.

Trial courts should adhere to the approved instructions. Nonetheless, we will reverse only when the instructional error is so prejudicial that it deprived the defendant of a fair trial. *Drisdel*, 417 S.W.3d at 782. We find the defendant suffered no prejudice from the language in the verdict director for first-degree robbery, and certainly she suffered no manifest injustice. We deny the defendant's third point.

### *Point IV*

In her final point, the defendant claims the trial court abused its discretion in overruling her request for a mistrial when the State failed to edit a reference to Wiltermood's status as a sex offender from a video played for the jury of the defendant's interview with police. The defendant argues that the evidence of this offense was inadmissible and bailed by the court's order *in limine*, and that the effect was to plant the idea in the minds of the jurors that the defendant dated a sex offender, thus unfairly and irreparably prejudicing her. The defendant's argument lacks merit.

The State played an edited version of the interview the defendant gave Hannibal police the day of the robbery and murder. Early in that interview, the following exchange occurred:

Detective: Does Gary [Wiltermood] live with you?

Defendant: No. He's not allowed out there.

Detective: Okay. Let's talk real life, because I don't give a shit whether Gary's out there or not to be honest with you. That trespass doesn't mean anything unless I'm screwing with him right at that moment. But that's not my ... [indiscernible as the defendant begins speaking at the same time]

Defendant: He's not allowed out there because he's a sex offender, he's got a sex offense.

Detective: Right, I understand that, Like I said, really how many people are out there who ain't supposed to be out there? Hundreds ..

Defendant: Yeah, yeah ... [indiscernible as the defendant and detective speak at the same time]

Detective: So I appreciate that. I'm just asking does he live with you, stay out there? I don't give a shit one way or another.

The defendant did not object at the time this exchange was played, but requested a mistrial after the video ended. The court denied the request. The court then asked defense counsel: "Do you have any other request you want to make on that? Anything you want me to say to the jury?" Defense counsel did not respond to the court's invitation and request that the jury be instructed to disregard the sex-offender reference, and the proceedings returned to open court.

■ We review the denial of a request for a mistrial for an abuse of discretion. *Alexander*, 505 S.W.3d at 391. The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the court, and is so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful consideration. *Id.* A mistrial constitutes a drastic remedy that is warranted only by the most compelling circumstances. *Morgan*, 366 S.W.3d at 581. The court should declare a mistrial only in those extraordinary circumstances when the prejudice to the defendant cannot be removed in any other manner. *Id.* Ordinarily, the trial court cures errors in the admission of testimony by instructing the jury to disregard the offending testimony rather than by declaring a mistrial. *Id.*

■ Evidence is inadmissible if it has no purpose beyond attempting to convince the jury of the defendant's guilt because of her association with another person. *State v. McBenge*, 507 S.W.3d 94, 113 (Mo. App. E.D. 2016). In this case, however, the sex-offender reference is analogous to an uninvited reference to other crimes. In determining the prejudicial effect of an uninvited reference to other crimes, Missouri courts generally examine five factors: (1) whether the statement was, in fact, voluntary and unresponsive to questioning or whether the State caused the reference; (2) whether the statement was singular and isolated, and whether the prosecution emphasized or magnified it; (3) whether the remarks were vague and indefinite, or whether they made specific reference to crimes committed by the accused; (4) whether the court promptly sustained defense counsel's objection to the statement, and instructed the jury to disregard the statement; and (5) whether, in view of the other evidence presented and the strength of the State's case, it appeared that the comment played a decisive role in the determination of guilt. *Morgan*, 366 S.W.3d at 582.

Here, we find no prejudice, First, the defendant herself volunteered the information to the detective, and her reference was not responsive to any question the detective asked. Second, the reference was singular and isolated. The State did not emphasize it during trial, nor did the State mention it in closing argument. Third, the reference was vague and indefinite in that it did not clearly identify Wiltermood or give any details about a particular sex offense. In addition, immediately before and after the reference, both the defendant and the detective spoke simultaneously, and the defendant's statement is not easily discernible. Next, defense counsel

did not object immediately at the time the reference was played for the jury, and he failed to respond to the court's invitation and request that the jury be instructed to disregard the reference. Had any prejudicial effect been created, it could have been removed by striking the reference and instructing the jurors to disregard it. *Id.* Finally, we find that the single, brief reference did not play a decisive role in the jury's verdict. By the time the State played the video, Wiltermood had already testified against the defendant, and acknowledged that he pled guilty to murder in the shooting death of Arnett. He also testified that he had been high on methamphetamine for "at least a few weeks" the night of the murder, had problems with alcohol, and had a "pretty extensive" criminal history.

We find the trial court did not abuse its discretion in denying the defendant's request for a mistrial. We deny the defendant's fourth point.

## Conclusion

We find that the State made no promise that it would not prosecute the defendant, and thus we hold that application of the equitable-immunity doctrine is not warranted. We also hold that the trial court did not abuse its discretion in refusing to admit a letter from the initial prosecutor about the defendant's cooperation, that the trial court did not commit prejudicial error when it gave the jury the verdict director for first-degree robbery, and that the trial court did not abuse its discretion when it denied the defendant's request for a mistrial. We affirm the trial court's judgment.

PHILIP M. HESS, P.J. and KURT S. ODENWALD, J., concur.